(644 P.2d 1354)
No. 52,954

ROBERT BAKER and ROGER DeHART, *Appellants,* v. R. D. ANDERSEN
CONSTRUCTION CO., INC., *Appellee.*
Petition for review denied July 21, 1982.

Opinion filed May 20, 1982.

*Thomas H. Marshall* and *Steve A. J. Bukaty,* of Blake & Uhlig, of Kansas City, for appellants.

*Stewart L. Entz,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka, for appellee.

Before SPENCER, P.J., REES and MEYER, JJ.

MEYER, J.: This appeal was taken by plaintiffs Robert Baker and Roger DeHart (appellants) from an involuntary dismissal of their action filed pursuant to K.S.A. 44-201 *et seq.*

By agreement dated May 2, 1978, between the appellee, R. D. Andersen Construction Co., Inc., and the State of Kansas, Kansas Neurological Institute, the appellee was to complete general construction of the Honey Bee Lodge and Hospital Care Facility for a total contract price of $1,553,560.00. The contract, at paragraph 9, states as follows:

"And it is expressly understood by each party to this contract, that the same shall be performed according to the provisions of K.S.A. 44-201, which is generally known as the 'eight-hour law.' "

Appellant Baker was employed by the appellee on the subject project beginning on July 29, 1978, and ending on November 4, 1978. During the time of his employment, appellant Baker performed work for the appellee and was compensated at the rate of $4.25 per hour.

Appellant DeHart began work for the appellee on the subject project on October 17, 1978, and his employment terminated on November 3, 1978. During that time he performed work for the appellee and was paid at the rate of $3.50 per hour.

After learning of the provisions of K.S.A. 44-201, which requires that the current rate of per diem wages be paid by contractors performing work for the State of Kansas, appellants initiated this action to recover the difference between the current

rate of per diem wages as established under the statute and the rate of wages they were actually paid by the appellee.

When the case came on for trial, appellants presented their evidence relating to the work which they actually performed and the rate of pay which they received for that work. As an aid in testifying, appellants prepared a "Summary of Work Done by Baker and DeHart," which was admitted by stipulation of the parties. After this evidence of the type of work actually performed, appellants offered the testimony of several expert witnesses. These witnesses expressed their opinions relating to "work of a similar nature," "greater number of workmen," and "current rate of per diem wages."

At the close of appellants' evidence, appellee moved for a directed verdict; the court, sitting without a jury, treated this as a motion for involuntary dismissal. The court upheld the motion and appellants' action was dismissed.

The court construed the statute in question as requiring a "task-by-task" analysis of the work done by appellants, followed by a computation of the per diem wage paid to the greater number of all workers in the locality who perform the same or similar tasks, regardless of the type of construction project where such tasks are performed. Appellants sought to prove that the prevailing wage for admittedly similar tasks varied according to the type of project setting (*i.e.,* residential, commercial or heavy construction), in which these tasks were performed. Their evidence was confined to the wages paid to workers performing similar tasks in similar project settings, that being heavy construction in this case. The court considered this inadequate proof, as evidence of wages paid to workers performing similar tasks in different project settings was not presented. Because the court believed that the statute required consideration of all workers performing similar tasks, it ruled that appellants' evidence failed to present a prima facie case, for they had excluded from their wage computations workers laboring in project settings different than their own. For this reason, the court sustained appellee's motion for involuntary dismissal.

Appellants filed the instant appeal, contending that the construction of K.S.A. 44-201 applied by the trial court was incorrect, and that under the correct construction of that statute appellants had indeed presented a prima facie case, and that therefore the dismissal of their petition was error.

The major issue in this case turns on whether the trial court's construction of 44-201 was correct. In ruling on the meaning and requirements of that statute, the lower court was stating a conclusion of law; appellate review of conclusions of law is unlimited. *State, ex. rel., v. Doolin & Shaw,* 209 Kan. 244, 261, 497 P.2d 138 (1972).

The general rules governing statutory construction are well established. The opinion of the court in *Coe v. Security National Ins. Co.,* 5 Kan. App. 2d 176, 180, 614 P.2d 455 (1980), contains an excellent review of several basic tenets, extracted from prior cases. To summarize the court's statements there, it has been held that the fundamental rule of statutory construction is that the intent of the legislature must control; all other rules of construction are subordinate. The legislative intent should govern even though it does not follow the literal words of the statute; words, phrases or clauses may be omitted or inserted in appropriate places to achieve this result. When a statute is susceptible to more than one construction, it should be considered in its entirety and in light of the legislative intent; a statute should never be construed so as to produce uncertainty, injustice or confusion if it is possible to construe it otherwise.

It is also clear that, in determining legislative intent, the courts should look to the purpose, necessity and effect of the statute. *State ex rel. Stephan v. Lane,* 228 Kan. 379, 390, 614 P.2d 987 (1980). Consideration should be given to the causes of a statute's adoption, the historical background and the effect the statute may have under the various constructions suggested. *State, ex. rel., v. City of Overland Park,* 215 Kan. 700, 713, 527 P.2d 1340 (1974).

The basic idea underlying all these rules is not a new one:

" 'It is not the words of the law but the internal sense of it that makes the law; the letter of the law is the body; the sense and reason of the law is the soul.' (Quoted from the dissent of Mr. Justice Harlan in the *Civil Rights Cases,* 109 U.S. 3 [1883], 27 L.Ed. 835, 3 S.Ct. 18.)" *Mahone v. Mahone,* 213 Kan. 346, 350, 517 P.2d 131 (1973).

These general precepts are the ones which we shall apply in determining the proper construction to be given 44-201, an undertaking necessarily antecedent to determining if the trial court's construction was correct.

K.S.A. 44-201, popularly referred to as the "eight-hour law,"

was first enacted, in a form not unlike today's statute, in 1891. Generally, it provides that on government-funded construction projects, all workers shall receive the minimum wage prevailing in their locality for such construction work and that eight hours of work shall constitute a day. An examination of some pertinent passages from the statute follows.

" 'The current rate of per diem wages' for the intents and purposes of this act shall be the rate of wage paid in the locality as hereinafter refined to the greater number of workmen, laborers or mechanics in the same trade, occupation or work of a similar nature. In the event that it be determined that there is not a greater number in the same trade, occupation or on similar work paid at the same rate, then the average rate paid to such laborers, workmen or mechanics in the same trade, occupation, or work shall be the current rate. The 'locality' for the purpose of this act shall be the county wherein the physical work is being performed: *Provided,* That where cities of the first or second class are located in said counties, each such city shall be considered a locality.

"Eight hours shall constitute a day's work for all laborers or other persons employed by or on behalf of the state of Kansas or any municipality of said state . . . . Laborers or other persons so employed, working to exceed eight hours per calendar day, shall be paid on the basis of eight hours constituting a day's work. Not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers or other persons so employed.

"And laborers and other persons employed by contractors or subcontractors in the execution of any contract or contracts with the state of Kansas or any municipality thereof shall be deemed to be employed by or on behalf of the state or such municipality so far as the hours of work and compensation herein provided are concerned.

"That the contracts hereafter made by or on behalf of the state of Kansas or by or on behalf of any county, city, township or other municipality of said state with any corporation, person or persons which may involve the employment of laborers, workmen or mechanics, shall contain a stipulation that no laborer, workman or mechanic in the employ of the contractor, subcontractor or other person doing or contracting to do the whole or a part of the work contemplated by the contract shall be permitted or required to work more than eight (8) hours in any one calendar day except in cases of extraordinary emergency (as defined in this act); such contract shall contain a provision that each laborer, workman or mechanic employed by such contractor, subcontractor or other person about or upon such public work shall be paid the wages herein provided . . . ."

Even though this law has been on the books for 90 years, the number of published cases involving a construction of the act are very few, and most of these are not helpful to this case because they deal with the "eight-hour," not the "current rate of per diem wages" provision; for this reason, there can be honest dispute as to what is the true and correct construction of the statute.

The earliest reported cases involved claims by plaintiffs that

they had been forced to work periods in excess of eight hours per day. In these cases, the courts naturally tended toward stressing that arm of the statute when speaking to the purpose of the law.

"When the eight-hour law was passed . . . . [t]he leading idea clearly was to limit the hours of toil of laborers, workmen, mechanics, and other persons in like employments, to eight hours, without reduction of compensation for the day's services." *In re Ashby,* 60 Kan. 101, 106, 55 Pac. 336 (1898).

Even in the early cases, involving only claims of excess time being extracted from workers, statements were made by the courts which reflect a recognition that the statute had a broad scope and purpose, that being to protect the public good.

"The purpose [of the statute] . . . . is to relieve laborers, workmen, mechanics and similar employees from the pressure of economic conditions which compel them to work beyond just limits of time and endurance. It is a human life, health and welfare statute, to be given a beneficial interpretation for the public good." *State v. Ottawa,* 84 Kan. 100, 105, 113 Pac. 391 (1911).

The more recent expressions of opinions regarding the purpose and requirements of the statute indicate an increasing awareness that its "current rate of per diem wages" provisions should be given equal status with the "eight-hour" mandates. The statute has been likened to the Davis-Bacon Act, 40 U.S.C. § 276a. This federal law, and the regulations adopted in conjunction with it, require a wage delineation between similar classes of labor when performed in different project settings. The similarity of purposes of these two acts was pointed out in Att'y Gen. Op. No. 77-298, at page four:

"[T]he 'current rate of per diem wages,' as defined by K.S.A. 44-201 . . . . appears to be substantially identical to the prevailing wage which is determined by the United States Secretary of Labor in the administration of the Davis-Bacon Act, 40 U.S.C. § 276a. That section requires that specified federal public works contracts include a stipulation requiring that

'the minimum wages to be paid various classes of laborers and mechanics . . . shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed *on projects of a character similar* to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed . . . .' " (Emphasis added.)

In this opinion, the attorney general went on to state that, while not mandatory, it would be preferable if advertised specifications for public projects in Kansas specified the prevailing minimum wage rates for the various classes of labor necessary under the

contract. To our knowledge, this suggestion has never been attacked; in fact, a contract which did specify the wage rates to be paid (using the Davis-Bacon figures of the Department of Labor) was upheld; such figures may be used in the plans and specifications on which competitive bidding will be based, as long as the figures used meet or exceed the "current rate of per diem wages" as defined in 44-201. *Andersen Construction Co. v. City of Topeka,* 228 Kan. 73, Syl. ¶ 6, 612 P.2d 595 (1980).

Admittedly, these two acts (K.S.A. 44-201 and Davis-Bacon) are not identical. When the attorney general, in opinion 78-42, declared that K.S.A. 44-201 *required* that all plans for publicly-funded projects contain wage specifications from Davis-Bacon, this ruling was challenged in the courts. The Kansas Supreme Court "reversed" the attorney general, stating that 44-201 would *allow* Davis-Bacon wage specifications, but did not *require* them. See *Andersen Constr. Co. v. Weltmer,* 224 Kan. 191, 577 P.2d 1197 (1978).

We note, however, that in neither of the two cases immediately aforementioned did the high court address the issue of statutory construction now before this court. Thus, in *Andersen Construction Co. v. City of Topeka,* 228 Kan. 73, Syl. ¶ 4, it was stated:

"K.S.A. 44-201 was enacted not for the benefit of contractors but to protect employees by fixing a floor under wages on public projects. It is an expression of public policy that payment of low wages shall not give a contractor an advantage in bidding or securing a public contract."

Having examined the relevant case law surrounding 44-201, the nut of the instant case is this: the issue here involves a question of public policy; that is, does 44-201 implicitly require that account should be taken of the fact that workers performing similar tasks often receive different wages depending on the type of construction project involved, and therefore only those workers performing similar tasks in similar project settings should be considered when computing the "current rate of per diem wages" for a particular public project; or, should we reject this implication, and hold (as did the trial court) that in making such wage computations, all workers performing similar tasks must be considered, regardless of the type of construction project they are engaged on?

Appellants urge the first construction. They point out Davis-Bacon and the acts of numerous states, all of which require a

"project-based" analysis in wage-rate computations. They argue that a refusal to adopt such a requirement will allow contractors to pay their workers less on a public contract than they would on a private project of the same character; this, they contend, would eviscerate 44-201.

Appellee argues that the trial court's construction of 44-201 was correct. It points out that the statute contains no mention of projects; also, that no court opinion has ever explicitly stated that the statute should require a project-based analysis. It accepts that Davis-Bacon and the laws of many other states require delineation of projects in wage-rate computations, but insist that these laws are distinguishable from 44-201.

This court feels that the construction of 44-201 advanced by appellants is the better of the two, and we adopt it as the law in Kansas.

A major policy underlying 44-201 is that workers employed on public works projects should receive the same wages as workers doing the same tasks on a substantially similar private project. Thus, one purpose of the law is to insure that workers engaged in public projects are not penalized by receiving a lower wage than workers in the private sector.

Workers, although in the same generic class of employment, are not necessarily always in the "same trade, occupation or work of a similar nature," to use the statutory language. Persons employed to do similar tasks may nevertheless not be in the "same trade, occupation or work of a similar nature," owing to the fact that such workers perform these similar tasks in substantially different work environments. The "eight-hour law" should be construed in light of these statements.

We hold that in computing the "current rate of per diem wages" for the purposes of 44-201, only those workers employed to do similar tasks on similar classifications of projects should be taken into account. Only if no classification of projects, and therefore no differential wage rates exist, should consideration be given to all the workers in the locality doing similar tasks, regardless of the project setting they work in.

Because the wage rates paid to workmen do vary in many localities, according to the type of construction project involved, it is only being realistic to require the "current rate of per diem wages" under 44-201 to be computed according to the rate of

wages prevailing in the locality on projects of a nature similar to the one under consideration. A major purpose of 44-201—to prevent contractors from paying lower wages on public contracts than they would pay on an identical private project—would tend to be thwarted under the trial court's construction of that statute. A project-based analysis would also lessen the burden on a plaintiff who sues a contractor under 44-201, for his proof could be limited to similar projects, and would not have to involve all workers doing similar tasks in any setting. Further, a project-based construction would indirectly serve the "eight-hour" mandate of 44-201 in addition to directly affecting the "minimum wage" provisions. These two arms of the statute are like two sides of the same coin; if a worker is not paid an adequate wage for his eight-hour day of work on a public construction project, it is highly likely that economic pressures may force him to work at some other employment in addition thereto, thus obviating one purpose of 44-201, that being to prevent overworking of public employees.

The construction urged by appellants is not entirely without support in Kansas case law. In the case of *State, ex rel., v. Construction Co.*, 99 Kan. 838, 162 Pac. 1175 (1917), the court had before it a suit brought under a predecessor of 44-201. The issue was the rate of wages to be paid to concrete form builders on a bridge construction project. The plaintiffs there brought in evidence that while they had been paid only 40 cents per hour, workers building concrete forms on building projects received 65 cents per hour. The plaintiffs' evidence showed that the form builders in both settings performed very similar tasks. The defendants countered by arguing that form building on building projects required more skill than on bridge construction projects; they admitted, though, that the physical tasks performed by the workers (*i.e.*, sawing, hammering, etc.) were substantially the same in both settings. In rejecting plaintiffs' claims, the court ruled that the evidence showed, notwithstanding that the tasks performed were similar, that wage rates varied according to the type of project involved, and that plaintiffs had been paid the prevailing wage for the class of construction in which they had been engaged.

As we review the trial court's interpretation of K.S.A. 44-201—and especially that part of the record wherein the court concluded

that it made no difference what type of project the workmen were working at, whether it be residential, apartments, or commercial—it is apparent that the court used a purely task-by-task approach in defining "same trade, occupation or work of a similar nature." Such an approach, particularly if it implies that, for example, one who shovels cement at ground level is engaged in the "same trade, occupation or work of a similar nature" as one who shovels cement on one of the upper floors of a tall building, is incorrect.

As we interpret 44-201, application of the phrase "same trade, occupation or work of a similar nature" embodies more than simply comparing jobs on a task-by-task basis. Clearly, 44-201 was meant to prohibit the payment of lesser wages to persons working on public projects than are paid to persons working on projects of a similar nature in private industry. In addition, we have interpreted the statute to mean that a further factor must be considered. That is, by way of illustration but not by way of limitation, it seems obvious to us that one employed at a high-risk job should be paid more than a worker who performs the same "task" at a comparatively safe location. Therefore, if in the applicable locality, projects are classified or categorized for high-risk or any other reason, and if as to workers performing similar tasks, different wage-rates prevail between the different classes or categories, then 44-201 requires that the "current rate of per diem wages" be calculated according to the wages paid to workers on private projects of the same class or category as the public project involved.

It appears that in the instant case the parties conceded that appellants were employed at work designated as heavy construction. If this be true, then appellants were entitled to wages no less than those paid to the greater number of workers in the locality similarly employed in heavy construction.

The following excerpt from the transcript in this case makes it apparent that the trial court employed the wrong interpretation of K.S.A. 44-201:

"In this connection, however, I am satisfied that the statute requires· that we compare similar work in terms of the tasks done by the workmen in question. In that connection there is no basis whatsoever under this statute in my judgment to exclude from the workmen considered, in terms of determining what is that wage paid to the greater number, those who work on projects classified as residential or, for that matter, apartments or commercial."

We specifically reject the construction applied by the trial court, and hold that hereafter, computation of "current rate of per diem wages" under 44-201 shall be made in accordance with the statements of law made in this opinion.

Having concluded our discussion of the major issue in this case, a second issue must be addressed: namely, was the evidence adduced by appellants insufficient, even under the above construction of the law, to support a recovery by them?

The record in this case is a voluminous one, the evidence consisting primarily of opinion testimony by expert witnesses. These witnesses were business representatives from three union locals, a statistician, and an employee of the U. S. Department of Labor.

The union men examined the work summary, and each testified as to what tasks would fall within his union's jurisdiction and what would be the union scale wage for such tasks. Each union representative also opined that approximately 90 percent of the commercial construction projects in the Topeka area in 1978 paid union scale wages to the laborers; no numerical estimates of how many workmen these projects involved, compared to the total number of workmen on all commercial construction projects, were given. Each union representative admitted that laborers on different types of construction projects do perform tasks of a similar nature, but each also pointed out that the union scale wage varied, under the terms of applicable collective bargaining agreements, according to the type of construction project involved. These variations were said to be due in part to small differences in the degree of skill required for the different classes of construction and in part to different profit margins in the different classes of construction.

The employee of the Department of Labor testified concerning the wage rate delineations of the Davis-Bacon Act. He did not offer testimony regarding the prevailing wages in the Topeka area; his opinions regarding the legal meaning and effect of K.S.A. 44-201 are of questionable foundation.

Appellants' final witness, the statistician, presented the results of a survey taken in the Topeka area for the year in question, 1978; it was confined to workmen performing similar tasks on *similar projects.* This witness expressed his opinion, based on his survey, that the majority, or "greater number" of workmen per-

forming similar tasks on similar projects in the relevant area and during the appropriate time period, were paid union scale wages.

K.S.A. 1981 Supp. 60-241(b) provides in part as follows:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the plaintiff's evidence, the defendant, without waiving the defendant's right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in subsection (a) of K.S.A. 60-252."

Generally, when ruling on a motion for involuntary dismissal under K.S.A. 1981 Supp. 60-241(b) at the close of plaintiff's case, a trial judge sitting without a jury has the power to weigh and evaluate the evidence in the same manner as if he were adjudicating the case on the merits and making findings of fact at the conclusion of the entire case. *In re Estate of Ewers,* 206 Kan. 623, Syl. ¶ 1, 481 P.2d 970 (1971). On appellate review of an order of involuntary dismissal entered as per the situation above, the findings of fact made by the trial court will be upheld if there is substantial evidence to support them, and the evidence will be viewed in the light most favorable to the party prevailing at trial. *Armstrong v. City of Salina,* 211 Kan. 333, Syl. ¶ 6, 507 P.2d 323 (1973); *Burks v. Whalen,* 208 Kan. 222, Syl. ¶ 2, 491 P.2d 940 (1971).

The trial court in the instant case made no findings of fact. Moreover, the single conclusion of law stated by the court has been herein declared by this court to be erroneous.

The following excerpt from the record indicates that the trial court would probably have denied appellee's motion to dismiss if it had applied the construction of 44-201 which we have herein adopted. The trial judge said:

"Now, I do think, in this connection, that the defendant should be on notice that the only reason that this case fails, in my judgment, is because we do not have before us today adequate information to determine what the prevailing—I should use the statutory language—the per diem wage is for similar—as to what similar work is in this community."

This case must be reversed. We remand same to the district court, with instructions to reevaluate appellee's motion in light of the construction of K.S.A. 44-201 expressed in this opinion. The

court may elect to receive additional evidence if it deems it necessary to do so. Whether the trial court again sustains said motion, or whether same is overruled and a full trial is had, the court is directed to make specific findings of fact and conclusions of law as required by K.S.A. 1981 Supp. 60-241 and K.S.A. 60-252.

Reversed and remanded with directions.

REES, J.: Concurring.

I agree the trial judge applied K.S.A. 44-201 incorrectly, but I am unable to join in the majority opinion.

The principal question before us is whether ascertainment of the current rate of per diem wages under K.S.A. 44-201 requires account be taken of the kind of work performed by the contractor, the plaintiffs' employer, under its contract. While there is no case law under the present language of K.S.A. 44-201 addressing the question, I find *State, ex rel. v. Construction Co.,* 99 Kan. 838, 162 Pac. 1175 (1917), dispositive. Accordingly, I view it unnecessary and inappropriate to take upon ourselves pronouncement of public policy and legislative intent not expressed by the legislature. Such judicial pronouncements too frequently are mere description of consequences of legislative action, assumption of a legislative role, plain legal fiction, or flights of fancy. Reference to the Davis-Bacon Act (40 U.S.C. § 276a), regulations spawned under it, and opinions of our attorney general is unnecessary in the search for authority, precedential or otherwise, in this case.

By legislative action in 1931 (L. 1931, ch. 214, § 1), the relevant statutory provisions were amended so that the following is the pertinent language:

" *'The current rate of per diem wages'* for the intents and purposes of this act *shall be the rate of wage paid* in the locality . . . *to* the greater number of *workmen, laborers or mechanics in the same trade, occupation or work of a similar nature.* . . . Not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers or other persons . . . employed [by or on behalf of the state of Kansas]. And laborers and other persons employed by contractors . . . in the execution of any contract or contracts with the state of Kansas . . . shall be deemed to be employed by or on behalf of the state . . . so far as the . . . compensation herein provided [is] concerned." (Emphasis added.) K.S.A. 44-201.

Prior to 1931, the relevant statutory provisions were:

"[N]ot less than *the current rate of per diem wages* in the locality where the work is performed shall be paid to laborers, workmen, mechanics, and other per-

sons . . . employed by or on behalf of the state of Kansas . . . . [L]aborers, workmen, mechanics and other persons employed by contractors . . . in the execution of any contract . . . [with] the state of Kansas . . . shall be deemed to be employed by or on behalf of the state of Kansas . . . ." (Emphasis added.) (G.S. 1915, ch. 61, art. 3, § 5870.)

"[T]he current rate of per diem wages" was not statutorily defined prior to 1931. Even so, the issue at hand was effectively decided in *State, ex rel. v. Construction Co.,* 99 Kan. at 838-840, where it is said:

> "*The defendant,* under a contract with Wyandotte county, *is building a concrete bridge across the Kansas river in that county.*
>
> "This is an original proceeding in quo warranto. The defendant is charged with violating chapter 220 of the Laws of 1913 (Gen. Stat. 1915, § 5870). The action is brought to oust the defendant . . . from paying laborers less than the current rate of wages in the locality in which the work is being performed. The order now asked by the state is that . . . a temporary injunction be granted restraining the defendant . . . from paying such workmen less than the current rate of wages.
>
> . . . . .
>
> ". . . The plaintiff's evidence tends to show that the current rate of wages is sixty-five cents an hour for . . . 'form-building for reinforced concrete construction . . . .' . . . The plaintiff's evidence also tends to show that—
>
> > " '[T]he work of form building upon said Kansas river Central avenue bridge and its approaches required the same skill and ability, and was of the same class of work as the work done upon . . . buildings [erected for a milling company, an engineering company and two soap manufacturers].'
>
> "The defendant's evidence tends to show that the current rate of wages for form-builders for reinforced concrete work on bridges and viaducts constructed in Wyandotte county, Kansas, and in Kansas City, Mo., and on other reinforced concrete work similar to that done by the defendant . . . is not in excess of forty cents per hour . . . .
>
> . . . . .
>
> "The evidence of the plaintiff and that of the defendant do not directly contradict each other. . . . It appears clearly from the evidence of the plaintiff that *on certain buildings the current rate of wages* for form-builders *is sixty-five cents an hour.* It appears from the evidence of the defendant that *in bridge and viaduct work, the character of work being performed by the defendant, the current rate of wages is thirty-five to forty cents an hour.* So far as the question of wages is concerned, *this controversy must be determined upon the current rate of wages for the kind of work being done by the defendant.* The burden of proof is on the state. It has not established by a preponderance of the evidence that *the current rate of wages for the work being done by the defendant* is sixty-five cents an hour. The preponderance of the evidence is that *the current rate of wages for that work* does not exceed forty cents an hour." (Emphasis added.)

(In some parts of the briefs in the case before us, it seems to be overlooked that the defendant in *State, ex rel. v. Construction Co.*

was the contractor-employer, not a workman-employee.)

I find inescapable the conclusion that the Supreme Court held in *State, ex rel. v. Construction Co.* the ascertainment of "the current rate of per diem wages" requires account be taken of the kind or character of work performed by the defendant-employer under its contract; the test is not "task-for-task" on all and every kind and type of construction work in the locality. In *State, ex rel. v. Construction Co.,* the "kind of work" was bridge and viaduct work. Here the "kind of work" is the kind and type of construction work involved in the construction of the Honey Bee Lodge, whatever that kind and type of work was.

I am convinced the statutory definition of "the current rate of per diem wages" added in 1931 only emphasizes the requirement that account must be taken of the kind of work performed by the contractor-employer under its contract with the State.

The trial judge applied the wrong yardstick. Prior to final appellate decision of this case, he should be afforded the opportunity to pass upon the sufficiency and persuasiveness of the evidence the plaintiffs have presented in light of and upon application of the proper yardstick.