No. 62,879

SHELTER MUTUAL INSURANCE COMPANY, *Plaintiff/Appellee*, v. DANIEL B. WILLIAMS, by and through his father and next friend, ROBERT R. WILLIAMS, *et al.*, *Defendants*, and JAMES ALAN KEARBEY, *Defendant/Appellant*.

(804 P.2d 1374)

Opinion filed January 18, 1991.

*Elizabeth Lea Henry*, of Fletcher & Mathewson, P.A., of Wichita, argued the cause, and *Andrew B. Fletcher*, of the same firm, guardian ad litem, was with her on the briefs for appellant James Alan Kearbey.

*Reid Stacey*, of Kansas Department of Social and Rehabilitation Services, of Wichita, argued the cause and was on the briefs for appellant SRS.

*Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, argued the cause, and *Nicholas S. Daily*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a declaratory judgment action brought by Shelter Mutual Insurance Company (Shelter) to determine coverage under a homeowners insurance policy containing an

exclusion for "bodily injury or property damage expected or intended by an insured."

The facts are not in dispute. On January 21, 1985, James Alan Kearbey entered Goddard Junior High School armed with an M-1A rifle and a .357 magnum handgun. As he proceeded through the halls of the school, Kearbey fired the rifle several times, killing the principal, James McGee, and wounding Daniel B. Williams, Don Harris, and Dawn Swearingen.

Kearbey was a very intelligent 14-year-old who was having problems at home and at school, where he was failing every subject. Dr. Gary Hackney, a clinical psychologist, had been counseling Kearbey since 1983. He described him as an angry, upset, frustrated, and depressed young man. Kearbey repeatedly got into fights with fellow students and was called names. He had a particular problem with a group of "jocks," who picked on him a great deal. The evening before the shooting, Kearbey told a friend that one of his teachers was rough on him and that someone ought to shoot the teacher. At the school on the morning of the shooting, he told the same friend that he was "going to blow everybody through hell's gate." He left the school and went to his house about a block away. He later returned to the school and got into a prone position to try to shoot people in the building, but his glasses fogged up from the cold and he was unable to see. As he walked past the school office, Dawn Swearingen, a teacher, saw Kearbey and thought perhaps he was carrying the gun for some kind of speech. She called to the principal, who came out of the office and asked Kearbey what he was doing. Kearbey then swung around and began spraying the hall with bullets. The principal was shot once through the heart. Swearingen reported that Kearbey never said a word. Kearbey testified that this part had blanked out for him and he could not remember what had happened, although he remembered the spent cartridges coming out of the weapon.

Kearbey continued through the halls of the school and was confronted by another teacher, Don Harris. When Harris asked to see the rifle, he got no response. Kearbey walked by Harris with a brisk walk. When Harris called again, Kearbey turned, knelt, and fired the gun. He hit Harris and Danny Williams, a student.

Kearbey testified at trial that he did not intend to harm his victims but acknowledged his contrary deposition testimony that his objective was to "[g]et the dudes that were messing with [him]." After the shooting, Kearbey tried unsuccessfully to obtain car keys from two people and then fled the area.

At trial, Hackney testified that, when he met with Kearbey the next day, Kearbey was not actively psychotic. Hackney testified at trial, however, that at the time of the shooting Kearbey had a brief reactive psychosis, which meant a sudden onset of psychotic disorder. When Kearbey entered the school, he was out of contact with reality. Hackney testified that, when Kearbey entered the school, he was goal-oriented, but when he realized that the boys who had been picking on him were not in the gym, he "lost it." According to Hackney, a good description of Kearbey's conduct at this time was "walking into a very dense fog," because Kearbey could not distinguish fantasy from reality.

Daniel Williams and Don Harris brought an action for damages against Kearbey, his parents, and the Goddard school system. In that action, Kearbey's parents demanded that Shelter provide coverage and defend them under a previously issued homeowners insurance policy, which provided coverage for personal liability and medical payments to third parties. One provision of this policy excluded coverage for "bodily injury or property damage expected or intended by an insured." After the damages action was filed, Shelter brought this declaratory judgment action on May 29, 1986, to determine whether Kearbey's conduct was excluded from coverage.

Following the shootings, Kearbey was committed to the care and custody of the Kansas Department of Social and Rehabilitation Services (SRS) as a juvenile offender, pursuant to K.S.A. 38-1663(f). He was a resident at the Youth Center at Topeka when the petition here was filed. On June 6, 1986, the district court issued a summons with instructions to serve Kearbey at the Youth Center. The summons was returned, indicating service on Kearbey by leaving a copy with Bob Heintzelman at 1440 N.W. Highway 24. Heintzelman was a Social Services Administrator IV and Program Director at the Youth Center.

On October 29, 1986, the Kearbeys moved for appointment of a guardian ad litem for Kearbey, pursuant to K.S.A. 1989 Supp.

60-217(c). The motion was sent to Kearbey in care of Dr. Carol Mills at the Youth Center but was not directly served on SRS. On October 29, 1986, the district court appointed a guardian ad litem and ordered that compensation be paid from funds of the State Secretary of SRS pursuant to K.S.A. 38-1616. SRS entered a special appearance in the case and sought to amend the order, arguing lack of notice, lack of personal jurisdiction, lack of authority under K.S.A. 38-1616, liability of the parents, conflict of interest, and the parties' duty to assume the costs of litigation. The motion was overruled. When Shelter sought an order directing an agent to receive service of process on Kearbey, the court held that service upon Dr. Robert C. Harder, State Secretary of SRS, and Dennis Molamphy, the guardian ad litem, would satisfy K.S.A. 1989 Supp. 60-304(b)(2). Summonses were returned showing personal service on Kearbey and on Dr. Harder.

On December 8, 1987, Molamphy moved to withdraw as guardian ad litem, which was sustained. The court appointed Reid Stacey, counsel for SRS, to represent Kearbey. Stacey requested relief from this order, which was overruled. Following a motion for reconsideration, the court withdrew the appointment of Stacey, appointed private attorney Andrew Fletcher as guardian ad litem, and ordered Shelter to pay the costs of the guardian ad litem if Kearbey prevailed, but ordered SRS to bear the expenses if Kearbey did not prevail. Kearbey turned 18 on July 26, 1988, but no action was taken to remove the guardian ad litem and he continues to represent Kearbey at this time.

Trial in this action began on August 16, 1988. The jury answered three questions submitted at trial, finding that Kearbey had expected or intended bodily injury to (1) Daniel Williams, (2) Dawn Swearingen, and (3) Don Harris. The court then entered judgment for Shelter, finding no coverage and no duty to pay damages.

Both defendants Kearbey and SRS appealed. Kearbey raises two issues:

(1) The district court erred in failing to adopt the majority rule of law, and a jury instruction to reflect this rule, that injuries caused by a tortfeasor who lacks the capacity to understand the nature and quality of his actions or who is mentally incapable of

controlling his actions cannot, as a matter of law, be excluded from insurance coverage which excepts the expected or intended acts of the insured; and

(2) the jury instructions regarding Kearbey's mental state were clearly erroneous and improperly defined the burden of proof.

The issue raised by SRS is whether the district court had personal jurisdiction over SRS to order SRS to pay the guardian ad litem fees.

The Court of Appeals, in affirming the district court as to Shelter's duty, adopted what it designated the "minority view," that an injury inflicted by a person who is mentally ill is " 'intentional' when the actor understands the physical nature of the consequences of the act and intends to cause the injury, even though incapable of distinguishing right from wrong." As to the payment of the guardian ad litem fees, the Court of Appeals held that the district court erred in ordering SRS to pay them because the court did not have personal jurisdiction over SRS.

When the Kearbeys were sued by Daniel Williams and Don Harris, the Kearbeys demanded that Shelter defend and indemnify them. Shelter concluded that Kearbey's actions might be excluded from coverage under the policy because of the exception for bodily injury or property damage expected or intended by an insured, but it fulfilled its duty to defend by providing counsel for the Kearbeys while serving a reservation of rights upon the Kearbeys.

In this declaratory judgment action, we must resolve the issue of coverage. In the trial of the damages suit by the victims, the jury found Kearbey 80% at fault but found his parents not at fault. In answering a special question, the jury concluded that Kearbey was insane at the time of the shootings. *Williams v. Kearbey*, 13 Kan. App. 2d 564, 775 P.2d 670 (1989). In instructing the jury, the district court rejected Kearbey's request that the instructions include a description of the insanity test based either upon the *M'Naghten* or the *Globe* tests. The Court of Appeals approved the district court's refusal to adopt the legal rule that injuries caused by a tortfeasor who lacks the capacity to understand the nature and quality of his actions or is mentally incapable of controlling his actions cannot, as a matter of law, be excluded from insurance coverage which excepts the expected or intended

acts of an insured. We must now decide whether an intentional injury exclusion clause precludes coverage where a mentally ill insured shoots and injures several innocent victims. This is a question of first impression for this court.

Shelter urges that the standard of review to be applied here is that for considering a jury verdict. It argues that if the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, will support the verdict, then the verdict should not be disturbed on appeal, citing *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 461, 738 P.2d 1210 (1987). Although application of the exclusionary clause in this case may simply involve a review of the record to determine whether it supports the jury's verdict, the question of whether the exclusionary clause here excludes acts committed by an insane insured is a question of law. *Mangus v. Western Cas. & Surety Co.*, 41 Colo. App. 217, 219, 585 P.2d 304 (1978). The lower court's interpretation of the insurance contract stated a conclusion of law; appellate review of conclusions of law is unlimited. *Baker v. R.D. Andersen Constr. Co.*, 7 Kan. App. 2d 568, 644 P.2d 1354, *rev. denied* 231 Kan. 799 (1982).

In Kansas, an insane person is still civilly liable in damages for his torts. *Williams v. Kearbey*, 13 Kan. App. 2d at 565; *Toepffer v. Toepffer*, 151 Kan. 924, 929, 101 P.2d 904 (1940). In affirming this longstanding rule, the court in *Williams* noted that American courts have unanimously chosen to impose liability on an insane person rather than leave the loss on the innocent victim. 13 Kan. App. 2d at 565. One of the leading cases on this issue is the decision by this court in *Seals v. Snow*, 123 Kan. 88, Syl. ¶ 1, 254 Pac. 348 (1927), which held: "An insane person who shoots and kills another is civilly liable in damages to those injured by his tort." In *Seals*, Snow shot and killed Arthur Seals, whose widow brought an action for wrongful death. Returning a general verdict for the plaintiff, the jury found in answer to special questions that Snow did not act in self-defense, that Snow was insane when he shot Seals, and that Snow was not able "to distinguish right from wrong" at the time he shot Seals. 123 Kan. at 88-89. Rejecting Snow's argument that he should not be held liable because he was insane, the court noted that public policy requires liability because the loss should be borne by the one

who caused it rather than by the innocent person. Furthermore, such liability would urge relatives of the insane person to restrain him and would prevent tortfeasors from pretending or simulating insanity to defend their wrongful acts causing damage to others. 123 Kan. at 90.

Although in Kansas an insane person is civilly liable for damages caused to those injured by his tort, the case law has not considered what impact insanity or mental illness has on a provision of an insurance policy providing coverage for tortious liability but excluding "bodily injury or property damage expected or intended by an insured."

In construing contracts, an ambiguity in the language of the contract will be strictly construed against the party who drafted the provision. An insurance policy is a contract; plain and unambiguous language contained within the contract must be given its plain meaning. Where an insurance contract is open to different constructions, the one most favorable to the insured must be adopted, but an ambiguity must not be created where none exists. *Central Security Mut. Ins. Co. v. DePinto*, 235 Kan. 331, 333-34, 681 P.2d 15 (1984). Insurance contracts will be strictly construed against the party drafting the provision and requires liberal construction in favor of the insured. *Brown v. Combined Ins. Co. of America*, 226 Kan. 223, Syl. ¶ 10, 597 P.2d 1080 (1979). In *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 79-80, 483 P.2d 1072 (1971), this court concluded that a provision excluding coverage for "bodily injury or property damage caused intentionally by or at the direction of the insured" was ambiguous and should be strictly construed against the insurer.

Recently, the Kansas Court of Appeals applied an intentional exclusion provision of a liability policy that excluded injuries intended or expected by the insured to exclude coverage of an injury caused by the insured's aiming and firing a pistol at close range. *Casualty Reciprocal Exchange v. Thomas*, 7 Kan. App. 2d 718, 721, 647 P.2d 1361, *rev. denied* 231 Kan. 799 (1982). The trial court found that the insured pointed a gun at a person and fired. No evidence indicated the insured was touched or bumped prior to the firing or that the insured did not intend or expect the injury that resulted. The court held:

"[A] liability policy provision excluding coverage for injuries expected or intended from the standpoint of the insured would exclude from coverage an injury in which it was shown that the insured injured another by aiming and firing a pistol at the injured person at close range, where there is no evidence offered in explanation that the insured had not intended or expected the injuries." 7 Kan. App. 2d at 721.

In reaching its decision, the court in *Thomas* applied the principle that a person is presumed to intend the natural and probable consequences of his acts but recognized that evidence of unusual circumstances could defeat this presumption. 7 Kan. App. 2d at 721. As an example of the operation of this principle, Kearbey argues that if a young child should injure another while playing with a handgun, it cannot necessarily be presumed that the child intended injury if the child did not have capacity to understand the consequences of his actions. Similarly, Kearbey argues that if an individual lacks the capacity to understand the consequences of his acts or to control his irrational impulses because he is insane, this presumption can be rebutted, and insurance coverage should not be excluded because it is an intentional tort.

In facts very similar to those of *Thomas*, this court again addressed the propriety of the trial court's determination that plaintiff's injury came within an insurance policy's expected or intended exclusion. *Bell v. Tilton*, 234 Kan. 461, 467-68, 674 P.2d 468 (1983). The parties agreed that the insurance company had the burden of proving the applicability of the exclusion. The tortfeasor, a juvenile, fired a BB gun at his playmate as he ran across an open door inside a hay loft. 234 Kan. at 462. The court noted that the boy who fired the weapon was aware that injury could occur as a natural and probable consequence of the act of firing at his friend. The court found *Thomas* indistinguishable except that a pistol rather than a BB gun was used. Although the child firing the BB gun testified that he did not intend to harm his playmate, this court concluded:

"[T]he act of shooting another in the face with a BB pellet is one which is recognized as an act so certain to cause a particular kind of harm it can be said an actor who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law." 234 Kan. at 471.

The court concluded that substantial competent evidence before the trial court supported its finding that the act of the child firing the gun was intentional. 234 Kan. at 472.

Shelter argues that the evidence here is more than sufficient to support the conclusion that Kearbey intended to cause bodily injury to third parties and expected that such harm would result from his actions when he went to the school with loaded firearms and fired several times. According to Shelter, the only real factual argument is that Kearbey was not in the mental state necessary to form an intent to cause harm. Shelter rejects this argument on the grounds that the jury also rejected it in reaching its verdict. According to Shelter, the jury reached this decision based upon Kearbey's insincere and preplanned response to accusations against him by relying upon insanity. The jury also heard testimony that Kearbey was highly intelligent and manipulative.

In the present case, the jury was asked to conclude whether Kearbey expected or intended the bodily injury to (1) Don Harris, (2) Daniel Williams, and (3) Dawn Swearingen. The jury was not asked separately whether it concluded that Kearbey was insane at the time of these acts. Kearbey asked that the jury be instructed on the insanity issue. Instead, he received two instructions concerning his mental status that provided as follows:

"Defendants contend that Alan Kearbey's mental state was such that he could not understand the nature of his acts and was unable to differentiate between fantasy and reality, and, therefore, could not intend or expect the natural consequences of his acts. The burden of proof is upon the defendants to prove that, because of his mental state, the acts of James Alan Kearbey were not intended or expected."

"Intent is a state of mind of the actor. Direct evidence of intent is not required. It is to be inferred from circumstance. Intent is present when a person deliberately, as opposed to accidentally or involuntarily, does an act knowing its probable consequences. A specific intent to injure a particular person is not necessary, if the actor intends that his act injure someone. When the act is intentional, the injuries are intentional. As elsewhere stated in these instructions, the burden of proof is upon the plaintiff, Shelter Insurance Company, to prove the acts of Alan Kearbey were intentional."

"Acts are not intentional where, because of the mental or emotional state of the actor, he is incapable of forming an intent. The burden of proof is upon the defendant[s] to prove that the mental or emotional state of James Alan Kearbey made him incapable of forming an intent."

Other courts have recognized a distinction between placing liability upon an insane individual for intentional torts and interpreting exclusionary provisions of insurance policies for intentional acts. The Idaho Supreme Court in *Rajspic v. Nationwide Mut. Ins. Co.*, 110 Idaho 729, 718 P.2d 1167 (1986), discussed the distinction as follows:

"As we stated in *Rajspic I*, Mrs. Rajspic's sanity is particularly relevant in determining whether she was capable of forming a state of mind to have intentionally injured Brownson. In *Rajspic I*, when we cited *McGuire v. Almy*, 297 Mass. 323, 8 N.E.2d 760 (1937), we did *not* thereby adopt a rule that where an insane person is found to have committed an intentional tort, an insurance policy excluding coverage for injuries intentionally caused by the insured will *always* operate to relieve the insurance carrier of liability for the tort judgment. If we had adopted such a rule—which has precedent in no modern jurisdiction—only then would the district court's grant of summary judgment to the respondent have been justified. Rather, we cited *McGuire* to support the general proposition that a person who is considered insane may still be capable of entertaining the intent to commit certain tortious acts even though he entertains that intent as a consequence of his delusion or affliction. [*McGuire*] at 327-29, 8 N.E.2d at 762-63; *Rajspic I*, *supra* at 664, 662 P.2d at 536. The *McGuire* case had nothing to do with insurance coverage, let alone clauses that excluded coverage for injuries intentionally caused by the insured. *McGuire* was not cited by this Court to insinuate that the treatment of intentional torts and the application of insurance exclusion clauses should be synonymous. They involve two fundamentally different areas of the law, each founded on separate and distinct legal theories and principles." 110 Idaho at 731-32.

Although this is a question of first impression for this court, two conflicting lines of authority have developed in other jurisdictions. One set of cases holds that if an insured is suffering from a mental illness, the insured's acts cannot be treated as "intentional" within such an insurance clause. *Globe American Cas. Co. v. Lyons*, 131 Ariz. 337, 340, 641 P.2d 251 (1981). This is based upon policy considerations that view the purpose of incorporating intentional injury exclusions into insurance policies as an attempt to preclude persons from benefiting financially when they cause injury. Because an individual who lacks mental capacity to conform his conduct to acceptable standards will not be deterred by the existence or the nonexistence of insurance coverage for the consequences of his conduct, such exclusion is viewed as inappropriate. *Globe*, 131 Ariz. at 339-40.

Under the other line of cases, an injury inflicted by a person who is mentally ill is considered "intentional" within the meaning of the exclusion if the evidence shows that the actor understood the physical nature and consequences of his conduct and had the purpose and volition to cause the injury even though the individual was incapable of distinguishing right and wrong. *Colonial Life & Accident Insurance Co. v. Wagner,* 380 S.W.2d 224 (Ky. 1964); *Johnson v. Insurance Co. of No. America,* 232 Va. 340, 346, 350 S.E.2d 616 (1986).

Kearbey recognizes that the contractual intent behind the exclusion for expected and intended acts is to preclude financial benefit by individuals who deliberately cause injury to another, but argues that an individual who does not have the mental capacity to understand the nature and consequences of his acts or who is incapable of controlling his irrational impulses will not be deterred from acting because of existence or nonexistence of insurance coverage for his conduct. In such cases, Kearbey urges this court to follow those courts that have concluded that the impulsive or irrational act of an insane person cannot be found to be expected or intended for purposes of the exclusionary clause of the insurance policy here.

Some courts use the widely accepted standard for insanity in criminal matters, the *M'Naghten* rule, that involves two separate tests for defining legal insanity: A criminally insane actor may be unable to understand the nature and quality of his acts due to his psychosis, or he may understand what he is doing but be unable to recognize his conduct as wrongful. According to Kearbey, under the minority view, coverage would be excluded only if the tortfeasor cannot understand the nature and quality of his acts; thus, if the tortfeasor knew that he was shooting another person, but did not know it was wrongful because he had the delusion that God ordered him to shoot, coverage would be excluded. *Johnson,* 232 Va. at 347. Kearbey asserts that this rule ignores the purpose behind the insurance exclusion provision and the usual rules of construction in interpreting insurance contracts, arguing that it makes little sense to deny coverage if an individual hears voices commanding him to shoot, but allows coverage when a person acts without comprehending what he is doing.

In *Johnson*, 232 Va. at 347-48, the Virginia Supreme Court rejected a similar argument, stating:

"The victim argues, however, that the exclusion does not apply and Davis is entitled to coverage because he was incapable of controlling or desisting from the actions causing the injury. We reject this argument.

"In effect, the victim argues that, legally, one mind may not simultaneously be partly normal and substantially abnormal. But we have already confronted a similar dichotomy in the criminal context in *Price v. Commonwealth*, 228 Va. 452, 323 S.E.2d 106 (1984). There we stated that the two elements of the *M'Naghten* Rule, nature-of-the-act test and right-wrong test, logically can be separated. Quoting from a criminal treatise, we said:

" ' "The first portion of M'Naghten relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing. For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God." ' 228 Va. at 459-60, 232 S.E.2d at 110.

"Here, when Davis aimed the pistol at Johnson, he knew that he was shooting a human being. Acting deliberately and methodically, Davis had searched for and found a pistol, loaded it, travelled to the victim's home, waited for him, begun talking with him, and shot him from close range. He acted with resolve and determination, not knowing that what he was doing was wrong because God had ordered him to act. In pointing the pistol at Johnson, Davis did not think, for example, that he was peeling a banana; he was not psychotic to an extreme degree, as the victim readily recognizes when he notes that Davis 'did have this minimal degree of awareness of his actions.' That is sufficient. The shooting was not accidental, a risk insured against, but intentional."

Excluding coverage for an intentional injury arises from the belief that an individual should not be exempt from the financial consequences of his own intentional injury to another. We recognize that an individual who lacks substantial capacity to conform his conduct to the law will not be influenced by whether insurance exists to cover the consequences of his acts. We further recognize that the public's strong interest in compensating victims reinforces the well-settled principle that exclusionary clauses such as this should be interpreted as narrowly as possible. However, it does not follow that the concept of insanity relevant to the exclusionary

clause at issue in this case should be more expansive than the concept of insanity used in defense of a criminal charge.

We find the analysis of the Virginia Supreme Court in *Johnson* persuasive. We hold that an injury inflicted by an insured who is mentally ill is "intentional" within the meaning of the policy provision excluding coverage for intentional acts of the insured if the insured understands the nature and quality of his acts and intends to cause the injury, even though he is unable to recognize his conduct as wrongful.

Kearbey next argues that the district court erred in the way it instructed the jury about the impact of his mental state on the exclusionary provision of the insurance contract. He also argues that the district court failed to properly define the burden of proof.

The Court of Appeals noted Kearbey did not object to the instructions. The Court of Appeals, in finding the instructions were not clearly erroneous, stated:

" 'It is the duty of the trial court to properly instruct the jury upon the theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party.' *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88, 727 P.2d 450 (1986).

"The instruction was sufficiently clear for judging the impact of Kearbey's sanity or insanity upon the issue of intent. Kearbey was not prejudiced by this instruction.

. . . .

"The burden is upon the insurer to establish facts which bring the case within the exceptions contained in the policy. *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, Syl. ¶ 3, 483 P.2d 1072 (1971).

"In Kansas, Kearbey would be presumed to have intended the natural and probable consequences of his actions. *Casualty Reciprocal Exchange v. Thomas*, 7 Kan. App. 2d 718, 721, 647 P.2d 1361, *rev. denied* 231 Kan. 799 (1982). Where one person aims a gun at another and fires it, as in this case, it is presumed the act was intentional. *Casualty*, 7 Kan. App. 2d at 721. This is a rebuttable presumption, however. 7 Kan. App. 2d at 721. In Kansas, sanity is also presumed until the contrary is established. *Miller v. Hudspeth*, 164 Kan. 688, Syl. ¶ 8, 192 P.2d 147 (1948). Kearbey had the burden of proof to rebut the presumptions of sanity and intent by introducing evidence to support his contention that his mental condition prevented him from forming the necessary intent.

"The insured thus has the burden to show the loss falls within a coverage provision while the insurer has the burden to prove the loss is excepted or excluded by a specific provision of the policy. See *Kan. State Bank & Trust*

*v. Emery Air Freight*, 656 F. Supp. 200, 203 (D. Kan. 1987); *West American Ins. Co. v. McGhee*, 530 N.E.2d 110, 112 (Ind. App. 1988)."

We concur with the Court of Appeals' finding that neither instruction is clearly erroneous.

The final issue concerns who should be liable for the fees of the attorney appointed by the court to represent Kearbey as his guardian ad litem. The Court of Appeals concluded that no appropriate service was made to join SRS as a party, and no personal jurisdiction was ever acquired over SRS. Therefore, the trial court's assessment of attorney fees against SRS could not stand. Although, generally, attorney fees are not recoverable absent clear and specific authority, *Jones v. Smith*, 5 Kan. App. 2d 352, 354, 616 P.2d 300, *rev. denied* 228 Kan. 806 (1980), the drafters of the civil code and the legislature assumed that the court had inherent authority to compensate those who were called to assist it. Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-217(c) (1979). The Court of Appeals correctly concluded that the duty of a court to appoint a guardian ad litem necessarily implies an obligation to pay and the power of the court to fix reasonable compensation.

Pursuant to K.S.A. 38-1616, the expenses of the care and custody of a juvenile, which here were borne by the State social welfare fund, include things such as food, shelter, education, and ordinary medical care, but not the expense of attorney fees in a civil action. Because the Court of Appeals found no authority to assess attorney fees against SRS, it remanded the case to the district court to determine which of the remaining parties should be assessed the guardian ad litem fees. The guardian ad litem asked this court to decide the issue in this appeal to avoid the cost, expense, and delay of additional hearings and a subsequent appeal.

The district court has the power to appoint a guardian ad litem or to make other orders as it deems proper for the protection of the minor. K.S.A. 1989 Supp. 60-217(c). Gard notes that the policy of this rule is "to provide every infant or incompetent litigant with adequate representation, whether he be plaintiff or defendant." Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-217(c). Gard further notes that the drafters of the Code of Civil Procedure and the legislature assumed that a court has

inherent authority to compensate those called to its aid. Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-217(c). In *In re Estate of Showers*, 207 Kan. 268, 485 P.2d 299 (1971), a guardian ad litem was appointed to represent minors in an action to construe a will. The court rendered no opinion as to whether the provisions of 60-217(c) allowed taxation of guardian ad litem fees as costs because a provision of the probate code clearly allowed such fees. 207 Kan. at 275. The court approved taxation of the guardian ad litem fees as costs against the estate rather than against the heir who commenced the lawsuit. 207 Kan. at 275-76.

This lawsuit was initiated by Shelter to determine whether it should be required to pay any judgment that could arise as a result of the acts of Kearbey. The trial court incorrectly imposed attorney fees against SRS, which the Court of Appeals corrected because SRS was never properly served. Furthermore, the Court of Appeals pointed out that the provisions of K.S.A. 38-1616 requiring SRS to pay the expense of the care and custody of a juvenile offender would not cover attorney fees in a civil action that involved a juvenile during the period of custody with SRS.

No doubt the guardian ad litem should be compensated. Although no Kansas statute specifically provides for it, the court has inherent authority to compensate those who are called upon to assist it. *Ragan v. Looney*, 377 S.W.2d 273, 276 (Mo. 1964); Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-217(c). The question remains who should pay. Because Shelter, the parents, and SRS have not addressed the issue before this court, we agree with the Court of Appeals that the case should be remanded to the district court for determining which of the remaining parties should pay the guardian ad litem fees.

The judgment of the Court of Appeals is affirmed. The judgment of the district court is affirmed in part and reversed in part, and the case is remanded.

ABBOTT, J., not participating.

HERD, J., concurring in part and dissenting in part: I respectfully dissent from the majority holding that an act of a mentally ill person is intentional if he understands the nature and quality of his act and intends to cause the injury even though he is

mentally incapable of knowing his conduct is wrong. The jury found Kearbey "insane." An insane person is incapable of having the necessary "intent" to commit a crime. I would hold Kearbey's act lacks the necessary intent to qualify for Shelter's policy exclusion for intentional acts. The dividing of the *M'Naghten* rule between the "right-wrong" test and "the nature of the act" test is splitting hairs and is not sound. Either way the perpetrator of the act lacks intent to do wrong. To follow the majority is illogical and makes the burden of the injury fall on the innocent victims rather than the insurer of the insane tortfeasor.

I concur with the majority on its disposition of the guardian ad litem fee issue.