**STATE FARM FIRE & CASUALTY CO., Petitioner/Appellant,**

v.

**James C. WICKA, Special Administrator for the Estate of Stephen Bradley Kintop, Defendant,**

and

**Paul R. Peterson, Respondent.**

No. C4–90–312.

Supreme Court of Minnesota.

Aug. 30, 1991.

William M. Hart, Kenneth W. Dodge, Meagher & Geer, Minneapolis, for petitioner/appellant.

W. Scott Herzog, Peter A. Koller, Moss & Barnett, Minneapolis, for respondent.

## OPINION

GARDEBRING, Justice.

This case raises two issues, the first legal and the second evidentiary, involving whether an intentional act exclusion of a homeowner's liability policy applies to the conduct of an insured who, because of mental illness, may lack the capacity to form the intent to injure. In light of public policy favoring coverage where the injury threatens the general public, we construe the policy language as providing coverage where, because of mental illness, the insured's act is the product of a failure of the insured's volitional or cognitive capacities.

### I.

On the early morning of December 31, 1982, Stephen B. Kintop stormed into the living room of his ex-girlfriend, Colleen Hughes, smashing through the front door with a pistol in his hand. Standing in Hughes' living room was Paul R. Peterson, an acquaintance of Kintop's who was then dating Hughes. Upon seeing the gun brandished by Kintop, Peterson fled through the back door into the street outside. Kintop pursued. Firing as he chased the fleeing Peterson, Kintop shot Peterson several times, wounding him in the hip and head. Collapsing but still conscious, Peter-

son heard Kintop whimper as he reloaded and approached. Kintop then killed himself.

Incidents of erratic, abusive, and violent behavior characterized the relationship between Kintop and Hughes. In April of 1981, Kintop threatened to kill himself should Hughes end their relationship, showing her a gun as he uttered the threat. A month later, while driving with Hughes, Kintop pulled to the side of the road and punched Hughes in the face several times. Again, while driving with Hughes in June of 1981, Kintop pulled Hughes' head into his lap and accelerated, claiming he was going to kill them both. When Hughes finally ended the relationship in November of 1982, Kintop tried to rape Hughes and then shoved her head through her bedroom wall. On December 28, 1982, just days before his own death, Kintop again assaulted Hughes. While spending the night in her home as an invited guest, Kintop struck Hughes several times, pulled out her hair, spoke in weird language, and licked her head. The next morning, however, Kintop acted as though nothing unusual had happened.

Although Hughes had begun dating Peterson in November of 1982, Kintop continued seeing Hughes socially, and when Kintop arrived at the Hughes home around 3:00 a.m. on December 31, 1982, Hughes allowed him inside. Once inside, the two conversed until Hughes received a telephone call from Peterson. Realizing that Peterson was on the phone with Hughes, Kintop attacked Hughes, tearing off her bathrobe as he thrust his finger down her throat to stifle her cries. Kintop then lifted Hughes over his head, threw her to the floor, and fled. A short time later, Kintop called to tell Hughes that she would never see him again. Peterson later arrived at the Hughes home and chatted with one of Hughes' roommates, until Kintop, with gun in hand, burst through the door into the living room.

Despite severe injuries caused by multiple gunshot wounds, Peterson survived to sue Kintop's estate for damages. Defense of the suit was tendered to State Farm Fire

& Casualty Company (State Farm), the homeowner's carrier for Kintop's parents.[1] The tort claim was settled under a *Miller–Shugart* agreement, in which Kintop's estate assigned to Peterson its rights against State Farm under the policy. State Farm commenced the present declaratory judgment action, disputing coverage based on the policy's "intentional act" exclusion, which provides:

> 1. Coverage L—Personal Liability and Coverage M—Medical Payments to Others do not apply to:
>
> > (a) bodily injury or property damage which is expected or intended by the insured; * * *

After the trial court denied State Farm's initial motion for summary judgment in August of 1986, the case went to trial before a jury in September of 1988, the sole issue being whether Kintop, at the time of the shooting, lacked the mental capacity to intend to injure Peterson. The jury found in Peterson's favor, but the trial court later ordered a new trial, reasoning that it had violated Minn.R.Civ.P. 49.01(a) by disclosing to the jury how its special verdict would affect the outcome of the case. When the case was assigned to another judge in July of 1989, State Farm again moved for summary judgment.

Responding to that motion, Peterson submitted the trial testimony of Dr. William Brauer, the psychiatrist who testified at the jury trial. Dr. Brauer opined that Kintop had, at the time of the shooting, a "deranged mental intellect which did deprive him of the capacity to govern his conduct in accordance with reason." Counsel for Peterson elicited Dr. Brauer's opinion through a hypothetical question that detailed the facts of the shooting and Kintop's bizarre behavior in the days preceding the shooting. The second trial court rejected Dr. Brauer's testimony as lacking foundation because Dr. Brauer had never personally examined Kintop and had not complied with American Psychiatric Association standards, which the trial court said

prohibited testimony regarding mental capacity of another without direct knowledge of the individual. The second trial court reasoned that intent could be inferred based on Kintop's actions and his voluntary intoxication. It stated:

> The actions of Mr. Kintop were * * * bizarre and certainly qualify as wanton and malicious. He came to his friends [sic] house, pulled a gun, chased the victim several blocks and shot him several times. A trier of fact could not conclude other than that there was an intent to injure the victim.
>
> Because [Kintop] committed an act, an element of which is intent, and because [Kintop] was voluntarily intoxicated at the time of the commission of the act, his act is deemed to have been intentional regardless of his mental capacity to form intent. The assault is therefore within the intentional acts exclusion of the insurance policy.
>
> The issue of [Kintop]'s alleged mental capacity under these facts should not, as a matter of law, have been given to the trier of fact.

The second trial court granted summary judgment for State Farm, and Peterson appealed both that ruling and the previous order for new trial.

On appeal, the court of appeals panel affirmed the order for new trial, but reversed the grant of summary judgment. *State Farm Fire & Cas. Co. v. Wicka*, 461 N.W.2d 236, 242 (Minn.App.1990), *rev. granted* (Minn. Dec. 14, 1990). Embracing the rule adopted by the majority of states, the court of appeals panel held that an intentional act exclusion does not apply to "injuries resulting from acts committed at a time when, because of mental illness, the insured is unable to control his or her conduct in accordance with reason." *Id.* at 240. The court of appeals then reviewed the exclusion of Dr. Brauer's testimony, finding that the second trial court abused its discretion in rejecting that testimony

---

1. The court of appeals opinion erroneously states that Peterson, not Kintop, was insured under a homeowner's policy issued by State Farm; however, it is Kintop who is insured under a homeowner's policy issued to his parents by State Farm. *State Farm Fire & Cas. Co. v. Wicka*, 461 N.W.2d 236, 237 (Minn.App.1990).

based on Dr. Brauer's lack of a personal acquaintance with Kintop. *Id.* at 241. Holding that Dr. Brauer's testimony was admissible evidence, the court of appeals ruled that a genuine issue of material fact existed as to whether Kintop, at the time of the shooting, was deprived of the ability to control his conduct in accordance with reason. *Id.* at 241. This court granted further review on the reversal of summary judgment.[2]

## II.

The law and society have always approached a person's claimed mental illness with a degree of skepticism and disbelief.[3] This societal mistrust stems, in part, from the fear that mental illness is feigned with ease and frequency. *See United States v. Trapnell*, 495 F.2d 22, 24 (2d Cir.), *cert. denied*, 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974). Stronger skepticism arises when a putatively mentally ill person has a "normal appearance" or "doesn't look sick." Perlin, *Psychodynamics and the Insanity Defense: "Ordinary Common Sense" and Heuristic Reasoning*, 69 Neb. L.Rev. 3, 23 (1990). Despite these inherent suspicions, the concept that the mentally ill person should be relieved from responsibility for certain acts has existed for at least the past millennium. *See* Robitscher & Haynes, *In Defense of the Insanity Defense*, 31 Emory L.J. 9, 10 (1982). Within the area of insurance law, an extensive debate has occurred as to whether and when an insured's mental illness prevents the application of an intentional act exclusion to the acts of an insured. Two lines of authority have emerged, which agree that mental illness may affect the application of an intentional act exclusion, but disagree as to when that occurs.

The first line of cases holds, as a matter of law, that the intentional act exclusion does not apply if the injury results from an insane act.[4] Beyond this general premise, however, the cases diverge and articulate varying standards for judging the insured's capacity to act intentionally. *See* Comment, *Mental Incapacity and Liability Insurance Exclusionary Clauses: The Effect of Insanity upon Intent*, 78 Cal. L.Rev. 1027, 1045–51 (1990). Some courts have adopted what amounts to a "civil insanity" standard, applying coverage where the insured suffered from derangement of intellect that deprived the insured of the capacity to govern conduct in accordance with reason. *See Ruvolo v. American Casualty Co.*, 39 N.J. 490, 498, 189 A.2d

---

**2.** Peterson sought leave to file a late petition for review challenging the court of appeals decision regarding the order for new trial. Notwithstanding this court's denial of his motion, Peterson addressed the issue in his brief to this court. We will not entertain matters that are not properly before this court.

**3.** Make mad the guilty, and appal the free,

Confound the ignorant, and amaze, indeed,
The very faculties of eyes and ears.
Wm. Shakespeare, *Hamlet,* act 2, scene 2.

**4.** *Globe Am. Cas. Co. v. Lyons,* 131 Ariz. 337, 641 P.2d 251 (App.1981) (insured's inability to act in accordance with reason established by overwhelming testimony); *Congregation of Rodef Sholom of Marin v. American Motorists Ins. Co.,* 91 Cal.App.3d 690, 154 Cal.Rptr. 348 (1979) (testimony by insured's psychiatrist that insured had schizoid personality caused by mental disease); *Mangus v. Western Cas. & Sur. Co.,* 41 Colo.App. 217, 219–20, 585 P.2d 304, 306 (1978) (insured found not guilty of murder by reason of insanity); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Dunkel,* 363 So.2d 190, 193 (Fla. Dist.Ct. App.1978) (psychiatric testimony supported by

insured's history of extreme and bizarre behavior); *Aetna Cas. & Sur. Co. v. Dichtl,* 78 Ill. App.3d 970, 975–79, 34 Ill.Dec. 759, 763–65, 398 N.E.2d 582, 586–88 (1979) (insured found not guilty of homicide by reason of insanity); *West Am. Ins. Co. v. McGhee,* 530 N.E.2d 110, 112 (Ind.Ct.App.1988) (adopting defense but commission of irrational act does not equate with legal insanity); *Nationwide Mutual Fire Ins. Co. v. Turner,* 29 Ohio App.3d 73, 76–77, 503 N.E.2d 212, 216–17 (1986); *Ruvolo v. American Cas. Co.,* 39 N.J. 490, 498, 189 A.2d 204, 208 (1963) (insured certified as insane by psychiatrists and committed to state hospital); *Allstate Ins. Co. v. Miller,* 175 Mich.App. 515, 521–22, 438 N.W.2d 638, 642 (1989) (per curiam) (holding person cannot act "intentionally" when person, because of insanity, cannot form an intent to act). *But see Transamerica Ins. Corp. v. Boughton,* 177 Mich.App. 253, 440 N.W.2d 922 (1989) (agreeing with cases holding the acts of a person deemed insane may be intentional and within exclusion). Leading treatises on the subject lean toward this view. *See* 7A Appleman, *Insurance Law & Practice,* § 4501.09 (Berdal rev. 1979); 4 *Couch on Insurance,* § 27:156 (1984); 10 *Couch on Insurance 2d* § 41:696 at 706 (rev. ed. 1982).

204, 208 (1963); *Congregation of Rodef Sholom v. American Motorists Ins. Co.*, 91 Cal.App.3d 690, 695–97, 154 Cal.Rptr. 348, 351–52 (1979); *Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 340, 641 P.2d 251, 254 (App.1981). The necessary degree of impairment in other jurisdictions is less apparent. *See Mangus v. Western Casualty & Surety Co.*, 41 Colo.App. 217, 219–20, 585 P.2d 304, 306 (1978); *West American Ins. Co. v. McGhee*, 530 N.E.2d 110, 112 (Ind.App.1988); *Arkwright–Boston Manufacturers Mut. Ins. Co. v. Dunkel*, 363 So.2d 190, 193 (Fla.Dist.Ct.App. 1978); *Nationwide Mutual Fire Ins. Co. v. Turner*, 29 Ohio App.3d 73, 76–77, 503 N.E.2d 212, 217 (1986).

By contrast, the opposing, more narrow view, holds that injury caused by a mentally ill insured is intentional where the insured understands the physical nature of the consequences of the acts and intends to cause injury, though being incapable of distinguishing right from wrong.[5] Using the insured's ability to understand the nature and consequences of his actions as the benchmark for establishing whether an act was intentional, the narrow view maintains that an insane person may "intend" an act even though the person cannot appreciate the wrongfulness of that conduct. *See Johnson v. Insurance Co. of North America*, 232 Va. 340, 348, 350 S.E.2d 616, 620 (1986); 2 C. Torcia, *Wharton's Criminal Law* § 100 (14th ed. 1979). Many of these jurisdictions also adhere to an objective standard for determining intent. *See Casualty Reciprocal Exch. v. Thomas*, 7 Kan. App.2d 718, 647 P.2d 1361 (1982); *Utica Mutual Ins. Co. v. Travelers Indem. Co.*, 223 Va. 145, 286 S.E.2d 225 (1982); *State Automobile Mut. Ins. Co. v. Gross*, 188 Ga.App. 542, 543–44, 373 S.E.2d 789, 791 (1988). *But see Rajspic v. Nationwide Mutual Ins. Co.* (*Rajspic* II), 110 Idaho 729, 733, 718 P.2d 1167, 1171 (1986) (inference that insured acted with the purpose of causing injury could not be made based on insane insured's shooting of another).

While instructive, neither of these opposing views adequately describes when or why an insured's mental illness affects the exclusionary clause. Using words of uncertain meaning and effect, the more liberal view is ill-defined and sweeps too broadly. The rule embraced by the court of appeals suffers from these same shortcomings. *Wicka*, 461 N.W.2d at 240. Conversely, authority representing the narrow view is underinclusive and far too limited. Shrinking the inquiry to a solitary element of whether the insured understood the physical nature and consequences of an act produces a standard more restrictive than the *M'Naghten* rule in criminal law. Comment, 78 Cal.L.Rev. at 1054. Because all human behavior is goal directed, it is argued that under the narrow view only delir-

---

**5.** *Colonial Life & Accident Ins. Co. v. Wagner*, 380 S.W.2d 224 (Ky.1964); *State Automobile Mut. Ins. Co. v. Gross*, 188 Ga.App. 542, 373 S.E.2d 789 (1988) (insured testified he intended to kill victim and knew victim would die from shotgun blast); *Rajspic v. Nationwide Mutual Ins. Co.*, 104 Idaho 662, 662 P.2d 534 (1983) (*Rajspic* I); *Rajspic v. Nationwide Mutual Ins. Co.*, 110 Idaho 729, 733–34, 718 P.2d 1167, 1171– 72 (1986) (*Rajspic* II) (that insane insured could form intent to commit battery did not mean insured was capable of forming intent to cause injury); *Shelter Mutual Insurance Co. v. Williams*, 248 Kan. 17, 804 P.2d 1374, 1382–83 (1991) (injury inflicted by mentally ill insured is "intentional" where insured understands the nature and consequences of his acts and intended to cause injury although not understanding wrongfulness of the conduct); *Transamerica Ins. Corp. v. Boughton*, 177 Mich.App. 253, 440 N.W.2d 922 (1989) (agreeing with cases holding the acts of a person deemed insane may be intentional and within exclusion); *but see All-state Ins. Co. v. Miller*, 175 Mich.App. 515, 438 N.W.2d 638 (1989) (holding person cannot act "intentionally" when person, because of insanity, cannot form an intent to act); *Kipnis v. Antoine*, 472 F.Supp. 215, 220–21 (N.D.Miss. 1979) (no evidence that insured lacked mental capacity to understand his act); *Rider v. Preferred Acc. Ins. Co.*, 183 A.D. 42, 170 N.Y.S. 974 (1918), *aff'd* 230 N.Y. 530, 130 N.E. 881 (1920) (mem.); *DeLoache v. Carolina Life Ins. Co.*, 233 S.C. 341, 104 S.E.2d 875 (1958); *Pruitt v. Life Ins. Co. of Virginia*, 182 S.C. 396, 189 S.E. 649 (1937); *Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E.2d 616 (1986) (insured, now confined to state hospital, testified that he intended to shoot victim); *see generally* Annotation, *Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting Coverage of Injury or Damage Caused Intentionally by or at Direction of Insured*, 33 A.L.R.4th 983 (1984).

ious or semiconscious people would lack the intent to commit a violent act. Simon, *You Only Die Once—But Did You Intend It?: Psychiatric Assessment of Suicide Intent in Insurance Litigation*, 25 Tort & Insurance L.J. 650, 653–54 (1987). Even the stringent *M'Naghten* rule excuses if the individual could not understand the moral wrongfulness of the conduct, and it would be a particularly anomalous result to construe an insurance contract provision more harshly than our own criminal law standards.

Although we reject the formulations advanced under both the liberal and narrow views, we agree that an insured's mental illness can defeat the application of the intentional act exclusion. The question in need of answer remains, however: When and under what circumstances does an insured's mental illness defeat the application of the intentional act exclusion? To answer the question presented in this case of first impression, we examine the existing principles of law in this state regarding insurance and the application of intentional act exclusions.

▮▮ As it applies to sane individuals, the law in Minnesota is well-settled: an intentional act exclusion applies only where the insured acts with the specific intent to cause bodily injury. *See Woida v. North Star Mutual Ins. Co.*, 306 N.W.2d 570, 573 (Minn.1981); *see* 11 *Couch on Insurance* 2d § 44:289 at 449–50 (rev. ed. 1982). The requisite intent demands that the insured intended the harm itself, not that the insured intended to act. *Caspersen v. Webber*, 298 Minn. 93, 99, 213 N.W.2d 327, 330 (1973). Under this subjective standard, the necessary intent may be established by proof of an insured's actual intent to injure or by inference, when the character of the act is such that an intention to inflict injury can be inferred as a matter of law. *Farmers Insurance Exchange v. Sipple*, 255 N.W.2d 373, 376 (Minn.1977); *Caspersen*, 298 Minn. at 99, 213 N.W.2d at 330; *see* Note, *Intentional Injury Exclusion Clauses—What is Insurance Intent?*, 32 Wayne L.Rev. 1523, 1533 (1986). The inference arises when the nature and circum-

stances of the insured's act were such that harm was substantially certain to result. Annotation, *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured*, 31 A.L.R.4th 957, 988 (1984); *cf. Iowa Kemper Insurance Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978). Whether proven directly or by inference, the intent to cause bodily injury reflects the insured's state of mind about the desired harmful consequences of an action by the insured. In describing the legal significance ascribed to an insured's actions, the concept of intent embodies the simultaneous presence of two abilities; one cognitive and the other volitional.

▮▮ It is axiomatic that before an insured can be held liable the insured must have been able to entertain the proscribed intent to cause bodily injury and must have, in fact, done so. *See* Restatement (Second) of Torts § 895J, comment c (1979); *Rajspic v. Nationwide Mut. Ins. Co.* (*Rajspic* I), 104 Idaho 662, 664, 662 P.2d 534, 536 (1983). In *Woida*, this court inferred an intent to cause bodily injury where the insured, after planning the action with others, fired several shots from a high-powered rifle at a truck knowing that the truck was occupied. *Woida*, 306 N.W.2d at 573. Similarly in *Stone*, we held that the insured demonstrated an intent to cause bodily injury when, after agreeing to settle a dispute by fighting, the insured wrapped his fist with his belt and struck the other combatant. *Stone*, 269 N.W.2d at 886–87. Finally, in *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 244 N.W.2d 121 (1976), this court inferred an intent to cause bodily injury where the insureds had planned an armed robbery, knowing their weapons were loaded and that someone might be killed or injured. *Id.* at 177–78, 244 N.W.2d at 125–26. While mental capacity was not at issue, the inference of an intent to cause bodily injury in *Woida*, *Stone*, and *Toal* follows because the insureds understood the obvious nature of their respective actions and the foreseeability of harm flowing from those actions. Had these insureds not understood the na-

ture of their acts, no inference could ensue. *See* Note, *Insanity, Intent and Homeowner's Liability,* 40 La.L.Rev. 258, 261 (1979). While our cases demonstrate that an insured's cognitive capacity is presumed, the cognitive capacity requirement parallels the cognitive capacity test in our criminal law.

Under the criminal presumption of cognitive capacity, the law presumes sanity and places the burden of proving incapacity on the party asserting it. *See State v. Bouwman,* 354 N.W.2d 1, 4 (Minn.1984). Criminal responsibility is excused where the actor, because of mental illness, does not understand the nature of his actions or does not understand that those actions are wrong. *See* Minn.Stat. § 611.026 (1990). While a strict standard is justified before relieving criminal responsibility, we believe the statutory codification of the *M'Naghten* rule provides but a partial answer when dealing within the realm of insurance law. An intent to cause bodily injury requires not only that the insured appreciate the nature and wrongfulness of his actions, but the requisite intent also demands that the insured's actions be voluntary, originating from insured's own free will.

The law rests on a postulate of free will—that all persons of sound mind are presumed capable of conforming their conduct to the requirements of the law, and when any person freely chooses to violate the law or intrude upon another's rights, that person may justly be held responsible. *See People v. Drew,* 22 Cal.3d 333, 339, 583 P.2d 1318, 1320, 149 Cal.Rptr. 275, 277 (1978); Tyrell, *Insanity: A Crazy Defense,* 35 Med. Trial Tech. Q. 48, 53 (1989). In accord with this principle, our prior cases reveal that instinctual, reflexive or otherwise involuntary actions do not evidence the malign animus that points to an intent to cause bodily injury. *See Smith v. Senst,* 313 N.W.2d 202, 203–04 (Minn.1981); *Brown v. State Automobile & Casualty Underwriters,* 293 N.W.2d 822, 824–25 (Minn.1980); *Sipple,* 255 N.W.2d at 376; *see also American Family Mut. Ins. Co. v. Peterson,* 405 N.W.2d 418, 422 (Minn.1987) (assault committed by intoxicated insured

not within reasonable expectations of policy "[a]bsent an understandably provocative situation which induces an instinctive reflex or an impulsive defensive action."); *Caspersen,* 298 Minn. at 99, 213 N.W.2d at 330 (insured's conduct of pushing aside coatroom attendant did not indicate an intent to cause bodily injury although the insured intended the act which caused injury).

This court held in *Sipple* that the submission of the intent issue to the jury was warranted where the facts were in dispute and suggested that the insured acted instinctively in the form of a reflex when the insured struck a farmer during a heated exchange. *Sipple,* 255 N.W.2d at 376–77. Similarly, in *Brown,* we held denial of summary judgment proper where the insured argued he acted reflexively when he struck a baggage clerk after a tug-of-war over some luggage caused a deep cut in the insured's finger. *Brown,* 293 N.W.2d at 824–25. Finally, we rejected an insured's claims of self-defense and reflexive action in *Smith,* where the insured's own action escalated the violence of a barroom fray. *Smith,* 313 N.W.2d at 203–04. Each of these cases demonstrates that the insured's ability to choose the particular action is as much a part of the intent formulation as the insured's ability to appreciate the choice he has made. Moreover, intent becomes a question for the trier of fact when the evidence suggests that the insured was not the master of his own will.

The law in Minnesota strikes a delicate balance between societal and individual interests when dealing with the rights and responsibilities of the mentally ill. *See* Minn. Const. art. VII, § 1 (insane or mentally incompetent persons ineligible to vote); Minn.Stat. § 595.02(f) (1990) (person of unsound mind incompetent to testify); Minn.Stat. § 611.026 (1990) (excusing criminal liability where the actor, because of mental illness, did not know the nature of the act or that it was wrong); *see also Meils v. Northwestern Bell Telephone Co.,* 355 N.W.2d 710, 714 (Minn.1984) (suicide compensable under Workers' Compensation Act where injury causes mental derangement of such severity that it overrides nor-

mal, rational thinking and judgment); *Anderson v. Armour & Co.*, 257 Minn. 281, 101 N.W.2d 435 (1960); *Olsson v. Midland Ins. Co.*, 138 Minn. 424, 430, 165 N.W. 474, 476 (1917) (allowing recovery under accidental death policy where the insured's suicide was a product of insured's insanity). As our cases show, an intent to cause bodily injury requires that the insured possess both cognitive and volitional capacities, either of which may be affected by an insured's mental illness. We hold, therefore, that for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness.

This rule not only addresses the cognitive and volitional components already existing in the law concerning intentional act exclusions, but the rule also construes the insurance policy in accordance with the reasonable expectations of the insured. *Atwater Creamery Co. v. Western Nat'l Mutual Ins. Co.*, 366 N.W.2d 271, 277 (Minn. 1985). The purpose of the intentional act exclusion is to deny the insured a license to commit wanton and malicious acts. ·*Peterson*, 405 N.W.2d. at 422. Both insurer and insured expect coverage will lie for unintentional injuries caused by the insured, regardless of the insured's mental condition. Given these expectations, we see no discernable difference between injuries caused by a mentally ill insured, who lacks the ability to formulate an intent to injure, and the insured who acts out of reflex or self-defense. Nor do we believe any financial disincentive would sway those persons who, because of mental illness, lack the capacity to conform conduct to the law. In foreclosing insureds from manipulating their insurance coverage through the voluntary use of intoxicants, we stated:

[W]e are not inclined to create a situation where the more drunk an insured can

prove himself to be, the more likely he will have insurance coverage.

*Peterson*, 405 N.W.2d at 422. Unlike intoxication, mental illness is hardly voluntary and not laden with the potential for abuse or fraud.

In conclusion, our holding does not imply that this or any court could adequately describe the intellectual process in which the human mind transforms intangible thoughts into concrete action. With cognitive and volitional capacities serving as the essential parts of the intent equation, the rule containing these elements serves only a limited purpose of identifying those persons who, owing to mental incapacity, did not act with the intent excluded under the insurance contract. By drawing on cognitive and volitional aspects already existing in our insurance law, trial courts and juries will be better able to assess when and under what circumstances an insured's mental illness defeats the application of the intentional act exclusion.

### III.

■ The other issue raised in this appeal concerns the trial court's rejection of the psychiatric opinion offered in response to the motion for summary judgment. Responding to State Farm's motion for summary judgment, Peterson submitted the trial testimony of Dr. William Brauer, a psychiatrist, to show genuine issues of material fact existed regarding Kintop's mental capacity at the time of the shooting. Testifying in response to a hypothetical question based on the shooting and Kintop's unusual behavior days before, Dr. Brauer opined that at the time of the shooting Kintop had "a deranged mental intellect which did deprive him of the capacity to govern his conduct in accordance with reason." The second trial court rejected this opinion as lacking foundation, stating:

[I]t is this court's opinion that there was insufficient foundation for the tender of Dr. Brauer's opinion. Dr. Brauer did not ever interview Mr. Kintop, nor did he ever treat him for any problem, either physical or mental, nor did he review any

medical records of Mr. Kintop. There was no evidence of Kintop being treated for any psychiatric problems. * * *

Dr. Brauer's opinion is perhaps best described as "informed speculation", not the type of certainty courts require of most opinion evidence. It is apparent that the American Psychiatric Association's standards for rendering an opinion were not met here. The association's standards set forth that one should not testify regarding anyone's mental capacity without directly knowing that person. While Rule 703 of the Minn. Rules of Evidence is broad in its application, this appears to be beyond the scope of its intent.

Portraying this ruling as one questioning "whether Dr. Brauer's opinion would be helpful to the trier of fact because of his lack of personal contact with Kintop," the court of appeals held the trial court abused its discretion in excluding Dr. Brauer's testimony on the narrow basis of there having been no personal contact with Kintop. *Wicka,* 461 N.W.2d at 241 (citing Minn. R.Evid. 702). We agree with the result reached by the court of appeals, but for a different reason.

No dispute exists over the accuracy of the facts presented in the hypothetical or whether a non-examining psychiatrist is "qualified" to give expert testimony regarding a deceased's mental condition. *Anderson v. Armour & Co.,* 257 Minn. 281, 287–88, 101 N.W.2d 435, 439–40 (1960) (testimony based on the personal history of individual). Rather, State Farm argued and the trial court ruled that Dr. Brauer could not adequately assess Kintop's mental state without the benefit of a personal examination.[6] By referencing Minn. R.Evid. 703, the trial court questioned whether the hypothetical question itself presented sufficient facts to support Dr. Brauer's opinion, not whether Dr. Brauer was qualified or his opinion helpful. The foundational sufficiency of a hypothetical question, however, is judged by the contents of the question itself and not by whether the witness has ever examined the person, place or thing in question. *Cf. Wenner v. Gulf Oil Corp.,* 264 N.W.2d 374, 381 (Minn.1978). So long as the expert witness is qualified and the question contains sufficient facts to permit that witness to give a reasonable opinion based not on mere speculation or conjecture, the opinion of an expert witness may be adequately obtained upon hypothetical data alone. 2

**6.** Although cited by neither name nor number, the APA standard referenced by the trial court does allow a psychiatrist to ethically testify regarding another's mental capacity without a personal examination. It provides:

> On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention, or who has disclosed information about himself/herself through the public media. It is unethical for a psychiatrist to offer a professional opinion unless he/she has conducted an examination and has been granted proper authorization for such a statement.

American Psychiatric Association, *Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry* § 7(3) at 9 (1989 ed.) (the Goldwater Rule). Developed to protect both unsuspecting public figures and the psychiatric profession from the harms of psychiatric speculation, the standard is limited to public figures and would permit psychiatric testimony in criminal cases about the competency of a defendant without examination or consent. American Psychiatric Association, *Opinions of the Ethics Committee of the Principles of Medical Ethics*

*with Annotations Especially Applicable to Psychiatry* at 37–38 (1989 ed.). The psychiatric profession is not without a moral rudder when opinions are offered absent a personal examination. Recognizing the delicacy of the situation, the American Academy of Psychiatry and the Law states:

> Honesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination. While there are authorities who would bar an expert opinion in regard to an individual who has not been personally examined, it is the position of the Academy that if, after earnest effort, it is not possible to conduct a personal examination, an opinion may be rendered on the basis of other information. However, under such circumstances, it is the responsibility of the forensic psychiatrist to assure that the statement of his opinion and any reports or testimony based on this opinion clearly indicate that there was no personal examination and that the opinion expressed is thereby limited.

American Academy of Psychiatry and the Law, *Ethical Guidelines for the Practice of Forensic Psychiatry* IV & commentary (rev. 1989).

Wigmore, *Evidence* § 677 at 939 (Chadbourn rev. 1979).

Expert opinion may be based on facts in evidence presented in the form of a hypothetical question. *Scott v. Southview Chevrolet Co.*, 267 N.W.2d 185, 188 (Minn. 1978). The foundation for the hypothetical question posed to Dr. Brauer outlined undisputed facts already in evidence. Although a personal examination would most certainly bolster Dr. Brauer's opinion, that is a matter of weight, not foundation. The want of a personal examination in this case does not render Dr. Brauer's opinion as lacking foundation. Under these circumstances, the court of appeals correctly held that the trial court abused its discretion in rejecting the expert opinion and that a genuine issue of material fact exists regarding Kintop's mental capacity at the time of the shooting.

### IV.

Those parts of the decision of the court of appeals regarding application of the intentional act exclusion to acts committed by an insured suffering from mental illness and the foundational basis for the expert opinion are affirmed as modified.

Affirmed as modified.

COYNE, J., took no part in the consideration or decision of this case.

SIMONETT, Justice (dissenting).

I respectfully dissent from the court's formulation of what constitutes an intentional act.

If a sane person takes careful aim at and shoots another person, there is liability for an intentional tort, but, because the act is intended, there is no insurance coverage. Yet if an insane person aims at and shoots his victim, we say there is insurance coverage. But if there is insurance coverage, this means the intentional act exclusion is inapplicable, which means there is no specific intent to injure. But then, where is the tort liability? If there is no intent to injure there is no intentional tort, but neither, unless words are entirely cast loose from their moorings, can it be said that taking careful aim and shooting someone is an act of negligence.

The fact of the matter, it seems to me, is that an insane person does form a specific intent to injure his victim. Consequently, if there is to be insurance coverage, we must be able to say that the insured's act of shooting his victim is both intended and unintended. But how can the law have it both ways?

We must, I think, distinguish the standard of personal responsibility as it applies in the criminal law, as it applies in civil tort law, and as it is contemplated for liability insurance coverage. Criminal law, with its emphasis on punishment and moral condemnation, stresses the *mens rea* (the guilty mind). Tort law, with its emphasis on compensating the victim, prefers to hold the insane person to the same standard of personal responsibility as a sane person. The problem for the court, then, in construing the liability insurance policy in an insanity situation, is how to protect the insured from tort liability with its objective standard of personal responsibility, while at the same time respecting the language of the intentional act exclusion which adopts a subjective standard of personal responsibility.

I would use a liberalized version of the *M'Naghten* test in construing the intentional act exclusion. The majority opinion, however, seems to me to go further. It holds that an act is also unintended "where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness." But to tell the jury it may find a lack of intention where there is an inability to control one's conduct seems to me a return to an uncontrollable urge or irresistible impulse test. While I do not deny there is a volitional component to human actions, I would not introduce an overt volitional-type test into liability insur-

ance coverage. I would not do so for three reasons.

First of all, a mentally ill person, who knows he is doing wrong but does it anyway because he cannot help it, cannot be said to be committing an "unintentional act," at least not if words are to be given their ordinary meaning. Put another way, the compulsion to injure, from whatever source it may arise, is not incompatible with the existence of an intent to injure. Hence the failure to resist temptation is ordinarily not considered as an excuse to avoid legal blame.

Secondly, there is no practical way of distinguishing between an uncontrollable and a controllable impulse. Because an impulse has not been resisted does not always mean that it could not have been. The problem is that there is simply no way to draft a jury instruction that can effectively guide a jury. The irresistible impulse test leaves too much to conjecture and unverifiable theorizing, not to mention self-serving excuses, which perhaps is why the test has not gained favor in our criminal law. Furthermore, I do not think a person's cognitive and noncognitive impairments can be so neatly separated as the irresistible impulse test seems to assume they may be.

Third, I see no need for a volitional-type test. It seems to me that the *M'Naghten* test can be construed broadly enough to satisfy the purposes of liability insurance coverage without doing violence to the ordinary meaning of the language of the intentional act exclusion.

*M'Naghten* excuses criminal culpability if the insane person is incapable of distinguishing between right and wrong even when the person knows the nature of his actions. A mentally ill person, for example, may know he is killing or attempting to kill someone but because of his delusion he thinks he is acting in self-defense or he is unable to understand the nature and consequences of the moral choices presented. *See State v. Rawland*, 294 Minn. 17, 45–46, 199 N.W.2d 774, 790 (1972). In *Rawland*

the defendant, in the grip of a paranoid schizophrenic delusion, fatally stabbed his unsuspecting father in the back. There was expert testimony that defendant acted in self-defense, believing his fantasied enemies, embodied in the person of his father, were plotting to destroy him and he was without any avenue of retreat. *Id.* at 25, 199 N.W.2d at 779. In such situations, the person is incapable of regarding his act as wrong; or to put it another way, the mentally ill person is unable to "think rationally of the reasons which to ordinary people make that act right or wrong." C.L. Ten, *Crime, Guilt, and Punishment* 125 (1987) (quoting an Australian jurist, Chief Justice Dixon).

I would instruct a jury somewhat along the following lines in an insurance coverage case: You are to determine whether or not the defendant's intent to injure was intended within the meaning of the liability insurance policy. A person does not intend his wrongful actions if, because of mental illness or defect, he did not know the nature of what he was doing, or if he did know, he did not know it was wrong. A mentally ill person would not know that what he was doing was wrong if he was laboring under a mental disorder or delusion which rendered him incapable of ordering his thinking to evaluate rationally the matter then before him.

Under this approach, too, there would be a genuine issue of material fact to be resolved in this case, and consequently I agree the case must be remanded for trial. I join in the balance of the court's opinion.