**MEADOWBROOK, INC.,**
**et al., Respondents,**

v.

**TOWER INSURANCE COMPANY,**
**INC., Appellant.**

No. C6–95–1285.

Court of Appeals of Minnesota.

Jan. 30, 1996.

Review Granted April 1, 1996.

Marshall H. Tanick, Teresa J. Ayling, Mansfield & Tanick, P.A., Minneapolis, for respondents.

Mark M. Nolan, James T. Hynes, Stapleton, Nolan & McCall, P.A., St. Paul, for appellant.

Considered and decided by HARTEN, P.J., and KLAPHAKE and AMUNDSON, JJ.

## OPINION

HARTEN, Judge.

Liability insurer appeals from four partial judgments for attorney fees incurred by in-sured. The insurer claims that it had no duty to defend certain claims brought by employees of the insured, and it challenges the amount of fees awarded. We affirm the first three partial judgments, but we reverse and remand for modification the final partial judgment.

## FACTS

Respondent Meadowbrook, Inc. is a Deephaven publishing company. Respondent Bruce Lansky is Meadowbrook's sole shareholder and CEO. In 1991, four female employees of Meadowbrook brought suit (the *Kahmann* suit) against respondents (jointly Meadowbrook), alleging a number of different claims, most of which stemmed from alleged incidents of sexual harassment by Lansky.[1]

Meadowbrook tendered defense of the *Kahmann* suit to appellant Tower Insurance Company, Inc. (Tower), its liability insurer. Meadowbrook's policy contained the following provisions:

[Tower] will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of **bodily injury, property damage** or **personal injury** caused by an **occurrence** to which this insurance applies.

[Tower] shall have the right and duty to defend any claim or suit against the **insured** seeking damages payable under this policy, even though the allegations of the suit may be groundless, false or fraudulent.

[T]his policy does not apply: * * * to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** * * *.

When used in the provisions applicable * * *

bodily injury means bodily injury, sickness or disease * * *;

---

1. The plaintiffs' Second Amended Complaint made 52 separate claims against respondents. Claims against both respondents included sexual discrimination and harassment under Minn.Stat. § 363.03 (1990); intentional infliction of emotional distress; negligent infliction of emotional distress; and racial discrimination under section 363.03. Additional claims against Meadowbrook included violation of the whistleblower statute, Minn.Stat. § 181.932 (1990); reprisal under section 363.03; negligent failure to have an adequate sexual harassment policy; negligent hiring and retention; wrongful termination; defamation; and promissory estoppel. Additional claims against Lansky included battery and assault.

occurrence means an accident * * * which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured** and with respect to **personal injury**, the commission of an offense, or a series of similar or related offenses;

personal injury means injury which arises out of one or more of the following offenses committed in the conduct of the **named insured's** business: * * * (b) the publication or utterance of a libel or slander or of other defamatory or disparaging material * * *.

Tower notified Meadowbrook that only the defamation claims brought by two plaintiffs were covered under the liability policy, but it stated that it would "afford a complete legal defense to all of the allegations in the Complaint." Thereafter, counsel retained by Tower worked in conjunction with Meadowbrook's own counsel in defending the *Kahmann* suit.

On March 20, 1992, the district court granted Meadowbrook summary judgment in the *Kahmann* suit on a number of claims, including the plaintiffs' defamation claims.[2] Tower then withdrew its defense of Meadowbrook, claiming that no covered claims remained in the suit. Meadowbrook subsequently brought the instant declaratory judgment action seeking a determination that Tower still owed a duty to defend Meadowbrook in the *Kahmann* suit.

On January 14, 1993, the district court ruled that Tower remained obligated to defend Meadowbrook in the *Kahmann* suit. On April 16, 1993, the district court awarded Meadowbrook attorney fees for both the *Kahmann* suit and the declaratory action, and partial judgment against Tower was subsequently entered in the amount of $79,153.58.

On February 22, 1993, the three remaining plaintiffs voluntarily dismissed all of their claims except the plaintiffs' sexual harassment claims and one plaintiff's whistleblower and reprisal claims. On July 9, 1993, the district court again denied Tower's motion for summary judgment on the issue of the duty to defend. In subsequent orders, the district court made two more attorney fee awards to Meadowbrook, and partial judgments were entered against Tower in amounts of $23,264.13 and $32,169.92. In February 1994, Tower satisfied these two partial judgments and the earlier partial judgment for $79,157.58 (the first three partial judgments).

In January 1994, a bench trial was held in the *Kahmann* suit on the two remaining plaintiffs' claims (another plaintiff had dismissed her claims on the eve of trial after reaching a nominal settlement with Meadowbrook). On March 8, 1994, the district court issued findings and conclusions, and ordered judgments against Meadowbrook totaling $136,500. Meadowbrook subsequently settled these claims by paying the amount of the judgments, plus $78,500 for attorney fees.

On January 4, 1995, the district court ruled on cross-motions for summary judgment in the declaratory action. The court denied Meadowbrook's motion for indemnification for the amounts it paid to settle adverse judgments, ruling that they were outside policy coverage.[3] The district court also ruled, however, that Tower's duty to defend Meadowbrook in the *Kahmann* suit had extended through the trial. On April 27, 1995, the district court again awarded attorney fees, which resulted in entry of a final partial judgment against Tower in the amount of $94,246.50.

Tower now appeals from the four judgments for attorney fees, arguing that the district court erred in affirming its duty to defend Meadowbrook in the *Kahmann* suit. Tower also challenges the amount of fees awarded.

**2.** Summary judgment was also granted Meadowbrook on the racial discrimination, negligent hiring and retention, negligent failure to have an adequate sexual harassment policy, negligent infliction of emotional distress, and promissory estoppel claims.

**3.** The district court concluded that coverage was precluded in part because the plaintiffs were awarded only economic and emotional damages and therefore suffered no "bodily injury" or "personal injury." Meadowbrook has not appealed that decision.

## ISSUES

1. Did the district court err in ruling that Tower's duty to defend Meadowbrook in the *Kahmann* suit extended through trial and the post-trial settlement of the remaining claims?

2. If Tower's duty to defend Meadowbrook did continue, were the attorney fee awards (constituting the four separate partial judgments) excessive?

## ANALYSIS

**1. Duty to Defend.** Tower has appealed from summary judgments in favor of Meadowbrook on the issue of Tower's duty to defend Meadowbrook in the underlying *Kahmann* action. On appeal from summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Denike v. Western Nat'l Mut. Ins. Co.*, 473 N.W.2d 370, 373 (Minn.App.1991). The interpretation and construction of an insurance contract is a question of law, subject to de novo review. *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn.1994).

An insurer's duty to defend is broader than its duty to indemnify and does not depend on the merits of the underlying claim against the insured. *Denike*, 473 N.W.2d at 373.

> The obligation to defend is contractual in nature and is generally determined by the allegations of the complaint against the insured and the indemnity coverage afforded by the policy. However, the complaint is not controlling when actual facts clearly establish the existence or nonexistence of an obligation to defend. If any part of the cause of action against the insured arguably falls within the scope of coverage, the insurer must defend. Any ambiguity as to coverage at the pretrial stage is to be resolved in favor of the insured.

*Inland Constr. Corp. v. Continental Casualty Co.*, 258 N.W.2d 881, 883 (Minn.1977) (citations omitted). The insurer bears the burden of showing that all parts of the cause of action fall clearly outside the scope of coverage. *Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165–66 (Minn.1986).

If the complaint against the insured includes multiple claims, and one of the claims, if proved, would require the insurer to indemnify, the insurer must defend against all claims.

*Mutual Serv. Casualty Ins. Co. v. Luetmer*, 474 N.W.2d 365, 368 (Minn.App.1991).

An insurer that breaches its duty to defend is liable to the insured for attorney fees both for defense of the underlying action and for bringing the declaratory judgment action to enforce the duty. *Lanoue v. Fireman's Fund Am. Ins. Cos.*, 278 N.W.2d 49, 55 (Minn.1979). The insured may also recover attorney fees incurred for a successful appeal from the declaratory judgment action. *Denike*, 473 N.W.2d at 374.

When the *Kahmann* suit commenced, Tower conceded that the defamation claims were covered by Meadowbrook's liability policy, and it therefore undertook defense of the entire suit. Tower argues, however, that once the defamation claims were dismissed, it had no further duty to defend Meadowbrook because none of the remaining claims was "arguably" within the scope of the policy coverage. Tower asserts that the remaining claims were not covered for any of three reasons: (1) no claims for "bodily injury" remained; (2) the plaintiffs' alleged injuries were not caused by an "occurrence," as required by the policy; or (3) the policy's employment exclusion barred the remaining claims.

### Bodily Injury

The policy only covered claims for bodily injury, property damage, and personal injury. It is undisputed that, once the defamation claims were dismissed, no claims for personal injury remained, and claims for property damage were never asserted. Consequently, the issue is whether the remaining claims were for damages because of "bodily injury," which the policy defined as "bodily injury, sickness or disease."

The *Kahmann* complaint specifically alleged "bodily injury," and the plaintiffs testified in depositions to various physical ailments, including sleeplessness, sluggishness, neck and back pain, chest pain, a displaced

rib, stress, heart ailments, and headaches. In its findings of fact after the *Kahmann* trial, the district court stated that one plaintiff had related various physical problems to her therapist, which indicates that claims for bodily injury survived to trial. We conclude that claims for "bodily injury" remained after dismissal of the defamation claims.

### Occurrence

■ Tower also contends that any bodily injuries claimed by the *Kahmann* plaintiffs were not caused by an "occurrence," as required by the policy. The policy defined "occurrence" as "an accident * * * which results in bodily injury * * * neither expected nor intended from the standpoint of the insured."

Tower argues that the remaining bodily injury claims were based on intentional acts that did not qualify as "occurrences." Meadowbrook responds that the claims arguably arose from an "occurrence" because, although sexual harassment requires an intent to act, it does not necessarily suggest an intent to injure. The supreme court has noted this distinction, applying such "intentional act exclusions" as follows:

> [A]n intentional act exclusion applies only where the insured acts with the specific intent to cause bodily injury. The requisite intent demands that the insured intended the harm itself, not that the insured intended to act. Under this subjective standard, the necessary intent may be established by proof of an insured's actual intent to injure or by inference, when the character of the act is such that an intention to inflict injury can be inferred as a matter of law. The inference arises when the nature and circumstances of the insured's act were such that harm was substantially certain to result.

*State Farm Fire & Casualty Co. v. Wicka,* 474 N.W.2d 324, 329 (Minn.1991) (citations omitted).

Tower argues that sexual harassment *does* require proof of an intent to injure and that such intent must therefore be presumed in the plaintiffs' claims. Tower relies solely on *Rulli v. State Farm Fire & Casualty Co.,* 479 N.W.2d 87 (Minn.App.1992), *review denied*

(Minn. Feb. 19, 1992), for this proposition. In *Rulli,* we stated that the plaintiff's claim for disparate treatment sexual harassment included "as a necessary element of proof, intent to injure." *Id.* at 89. *Rulli,* however, involved claims of nonconsensual assault and battery, not creation of a hostile work environment. The *Rulli* court cited *Jostens, Inc. v. CNA Ins., Continental Casualty Co.,* 336 N.W.2d 544 (Minn.1983). The *Jostens* court concluded that a duty to defend existed there because it was still unclear whether the alleged sexual discrimination was intentional or unintentional. *Jostens,* 336 N.W.2d at 545. *Jostens* indicates, therefore, that a sexual discrimination claim may or may not involve an intent to injure, depending on the facts of the case. In *In re Discipline of Peters,* 428 N.W.2d 375 (Minn.1988), the supreme court stated that although "quid pro quo" sexual harassment may require proof of intent, "the creation of an hostile environment by sexual harassment does not depend on the intent of the perpetrator." *Id.* at 378. The *Kahmann* plaintiffs did not allege any quid pro quo harassment (making employment dependent upon performance of certain conduct); rather, the complaint alleges sexual harassment through the creation of a hostile work environment. Consequently, no intent to injure may be inferred here simply because the claims sounded in sexual discrimination.

Tower has not pointed to any evidence of an actual intent to injure the plaintiffs. Instead, Tower asks that we infer such intent as a matter of law from the character of the acts. The supreme court has inferred intent to injure from the nature of the alleged conduct in a number of cases. *See, e.g., R.W. v. T.F.,* 528 N.W.2d 869 (Minn.1995) (intent to injure inferred where insured, knowing he had herpes, transmitted the disease by consensual sexual contact); *State Farm Fire & Casualty Co. v. Williams,* 355 N.W.2d 421 (Minn.1984) (intent to injure inferred where authority figure sexually assaulted man with cerebral palsy); *Woida v. North Star Mut. Ins. Co.,* 306 N.W.2d 570 (Minn.1981) (intent inferred where insured fired gun at occupied truck); *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885 (Minn.1978) (intent to injure inferred where defendant wrapped a belt buck-

le around his hand before striking victim). Other cases reveal that "instinctual, reflexive or otherwise involuntary actions do not evidence the malign animus that points to an intent to cause bodily injury." *Wicka,* 474 N.W.2d at 330; *see, e.g., Brown v. State Auto. & Casualty Underwriters,* 293 N.W.2d 822 (Minn.1980) (intent not inferred as a matter of law where insured punched victim during argument).

Tower relies on *Rohrer v. Rick,* 529 N.W.2d 406 (Minn.App.1995). In *Rohrer,* the insured, who was upset with the victim's husband, made hundreds of harassing telephone calls over the course of forty days. *Id.* at 407–10. We inferred an intent to injure as a matter of law, noting that the insured's conduct did not constitute an unthinking reaction, but rather was repeated, calculated, and purposeful. *Id.* at 410.

■ Here, we hold that an intent to injure may not be inferred as a matter of law. The purpose of the intent-to-injure requirement "is to prevent extending to the insured a license to commit wanton and malicious acts." *Woida,* 306 N.W.2d at 573. The offensive conduct cited by the *Kahmann* plaintiffs was not malicious or calculated. The plaintiffs never alleged that Lansky intended to injure; rather, they alleged that his conduct created a hostile work environment. Because harm was not "substantially certain to result" from Lansky's conduct, it is at least arguable that the claims were for injuries not intended from the standpoint of the insured. Therefore, we hold that the plaintiffs' claims arguably satisfied the "intent to injure" prong of the policy's "occurrence" definition.

■ Alternatively, Tower argues that the allegedly injurious conduct did not constitute an "occurrence" because the conduct was not an "accident." *See Gilman v. State Farm Fire & Casualty Co.,* 526 N.W.2d 378, 381 (Minn.App.1995) (existence of accident and intent to injure are separate inquiries); *Sage Co. v. Insurance Co. of N. Am.,* 480 N.W.2d 695, 698 (Minn.App.1992) (same). "Accident" has been interpreted in this context to mean "an unexpected, unforeseen, or undesigned happening." *Sage Co.,* 480 N.W.2d at 698 (quoting *Hauenstein v. St. Paul–Mercury Indem. Co.,* 242 Minn. 354, 358–59, 65 N.W.2d 122, 126 (1954)).

The offensive conduct alleged by the *Kahmann* plaintiffs consisted of intentional acts and therefore, at first blush, does not appear to qualify as accidental. We have emphasized, however, that in determining whether there was an "accident" for purposes of a liability policy, the particular "wrongful event" must be identified. *See Gilman,* 526 N.W.2d at 383. In *Gilman,* we discussed our opinion in *R.W. v. T.F.,* in which the transmission of herpes was held to be an accident. *Id.* at 382 (citing *R.W. v. T.F.,* 510 N.W.2d 231 (Minn.App.1994), *rev'd on other grounds,* 528 N.W.2d 869 (Minn.1995)). We noted that, although the insured in *R.W.* may have intended the sexual contact, the wrongful event—the transmission of herpes—was not intended and therefore satisfied the "accident" requirement. *Id.*

Here, a fair application of *Gilman* yields the conclusion that the claimed injuries were arguably accidental. Lansky's acts—the comments, behavior, and physical contact—may have been intentional. The wrongful event, however, which gave rise to the plaintiffs' claims, was not the conduct itself, but the creation of a hostile work environment. Tower has not pointed to any evidence indicating that Lansky intended to create a hostile environment, and no such intent is required by the statute. *See* Minn.Stat. § 363.01, subd. 41(3) (1994) (defining "sexual harassment").

We hold that the plaintiffs did allege bodily injuries arguably resulting from an "occurrence" as required by the policy.

*Employment Exclusion*

■ Finally, Tower asserts that the remaining claims were precluded by the policy's employment exclusion, which barred coverage for bodily injury "arising out of and in the course of" an employee's employment by the insured. Tower contends that the instances of allegedly offensive conduct cited by the *Kahmann* plaintiffs derived from the plaintiffs' employment. Tower also notes that the statutory claims that survived to trial all required an employment relationship.

We conclude, however, that the exclusion does not apply to all of the conduct cited by the plaintiffs. In their complaint, the plaintiffs specifically mentioned three instances of conduct that occurred outside the scope of their employment: a remark at a pre-employment interview, a pinch at a company volleyball game, and telephone calls to a plaintiff's home inquiring about the plaintiff's personal life. After trial, the district court specifically found that the volleyball incident had occurred. Although these incidents were related to the plaintiffs' employment with Meadowbrook, the injuries allegedly caused by these incidents arguably did not arise out of *and in the course of* their employment. We hold that the remaining claims (after the dismissal of the defamation claims) were arguably not entirely precluded by the policy's employment exclusion.

▮▮ In summary, we conclude that arguably covered claims (and, therefore, Tower's duty to defend Meadowbrook) remained through trial. Accordingly, we hold that Meadowbrook was entitled to recover against Tower for Meadowbrook's reasonable attorney fees incurred in the *Kahmann* suit and in litigating this declaratory judgment action.[4]

▮▮ **2. Amount of Attorney Fees Awarded.** Tower next claims that the amount of attorney fees awarded in the four separate partial judgments was excessive. Fees awarded in this context are reviewed under an abuse of discretion standard. *See Wojciak v. Northern Package Corp.*, 310 N.W.2d 675, 681 (Minn.1981) (fee award after insurer's breach of its duty to defend, although liberal, did not constitute an abuse of discretion).

With one exception, we conclude that the fees awarded was not excessive. The district court reviewed the fee documentation and disallowed some claimed fees. Tower has not persuaded us that the fees were unreasonable in any particular way, and its comparison of the fees awarded with the fees it incurred from its own attorneys before terminating its defense of the *Kahmann* suit is meaningless in the absence of more detailed information concerning the number of hours worked and the charged rate.

Nevertheless, it appears that Meadowbrook claimed (and to a large extent was granted) all of the fees it incurred in bringing the declaratory judgment action against Tower. Some of those fees, however, were incurred in Meadowbrook's seeking summary judgment on the issue of indemnification (which motion was ultimately denied). Meadowbrook was entitled to fees it incurred only in enforcing the duty to defend, not the fees it incurred in seeking indemnification for adverse judgment on the merits of the *Kahmann* suit.

Consequently, we remand to allow the district court to modify the final partial judgment by eliminating attorney fees that Meadowbrook incurred in seeking summary judgment in the declaratory action on the issue of indemnification. The district court did not otherwise abuse its discretion in awarding fees, however, and we therefore affirm the first three fee judgments.[5]

## DECISION

Tower's duty to defend Meadowbrook in the *Kahmann* suit did not expire with the dismissal of the defamation claims because remaining claims were arguably within the scope of coverage. Particularly, the remaining claims arguably (1) alleged "bodily injury," (2) that was not intended by the insured, (3) that resulted from an "accident," (4) and that did not arise "out of and in the course of" the plaintiffs' employment. The district court did not abuse its discretion in awarding fees, except with respect to fees incurred by

---

4. In light of our decision that arguably covered claims remained through trial, we need not consider whether and when a liability insurer may terminate its defense of the insured once all arguably covered claims have been resolved.

5. Meadowbrook is also entitled to attorney fees incurred on appeal. To that end, Meadowbrook may, within ten days of the filing of this opinion, file and serve an affidavit specifying the fees requested. Tower will have ten days to respond to the affidavit, and we will then consider an award of appellate fees. *See Denike*, 473 N.W.2d at 374 (handling award of appellate fees in this manner).

Meadowbrook in seeking indemnification for its underlying liability in the *Kahmann* suit.

**Affirmed in part, reversed in part, and remanded.**